

Clerk of Court
*Ascension Parish*

CCESS Main Menu | Contact Us | Land Records | Maps | Civil Suits | Criminal Records | Pending Criminal Inquiry | Marriage Licenses | Order History | Your cart contains 0 document(s) | Log Out - swilliams@bwor.com

**Ascension Civil Suits Search**
**Suits List**

| Surname | Given | Party Type | Suit Type | Date Filed | Div | Cause of Action |
|---|---|---|---|---|---|---|
| ACTAVIS ELIZABETH LLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| ACTAVIS INC FKA | | D | 1 | 05/29/2020 | A | DAMAGES |
| ACTAVIS KADIAN LLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| ACTAVIS LABORATORIES FL I | NC FKA | D | 1 | 05/29/2020 | A | DAMAGES |
| ACTAVIS LABORATORIES UT I | NC FKA | D | 1 | 05/29/2020 | A | DAMAGES |
| ACTAVIS LLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| ACTAVIS MID ATLANTIC LLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| ACTAVIS PHARMA INC FKA | | D | 1 | 05/29/2020 | A | DAMAGES |
| ACTAVIS PLC FKA | | D | 1 | 05/29/2020 | A | DAMAGES |
| ACTAVIS SOUTH ATANTIC LLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| ACTAVIS TOTOWA LLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| ALLERGAN FINANCE LLC FKA | | D | 1 | 05/29/2020 | A | DAMAGES |
| ALLERGAN INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| ALLERGAN PLC FKA | | D | 1 | 05/29/2020 | A | DAMAGES |
| ALLERGAN SALES LLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| ALLERGAN USA INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| AMERISOURCEBERGEN DRUG CO | RPORATION | D | 1 | 05/29/2020 | A | DAMAGES |
| CARDINAL HEALTH INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| CEPHALON INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| CVS HEALTH CORPORATION | | D | 1 | 05/29/2020 | A | DAMAGES |

<<Prev  Page 1 of 4  Next>>

New Search



Clerk of Court
*Ascension Parish*

ACCESS Main Menu | Contact Us | Land Records | Maps | Civil Suits | Criminal Records | Pending Criminal Inquiry | Marriage Licenses | Order History | Your cart contains 0 document(s) | Log Out - swilliams@lawor.com

Ascension Civil Suits Search
Suits List

| Surname | Given | Party Type | Suit Type | Date Filed | Div | Cause of Action |
|---|---|---|---|---|---|---|
| CVS PHARMACY INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| CVS TN DISTRIBUTION INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| CVS TN DISTRIBUTION LLC F | KC | D | 1 | 05/29/2020 | A | DAMAGES |
| ENDO HEALTH SOLUTIONS INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| ENDO PHARMACEUTICALS INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| HIKMA PHARMACEUTICALS USA | INC | D | 1 | 05/29/2020 | A | DAMAGES |
| INDIVIOR INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| JANSSEN PHARMACEUTICALS I | NC | D | 1 | 05/29/2020 | A | DAMAGES |
| JANSSEN PHARMACEUTICALS I | NC | D | 1 | 05/29/2020 | A | DAMAGES |
| JANSSEN PHARMACEUTICALS I | NC | D | 1 | 05/29/2020 | A | DAMAGES |
| JANSSEN PHARMACEUTICALS I | NC NKA | D | 1 | 05/29/2020 | A | DAMAGES |
| JOHNSON & JOHNSON | | D | 1 | 05/29/2020 | A | DAMAGES |
| LOUISIANA WHOLESALE DRUG | CO INC | D | 1 | 05/29/2020 | A | DAMAGES |
| MALLINCKRODT LLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| MALLINCKRODT PLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| MCKESSON CORPORATION | | D | 1 | 05/29/2020 | A | DAMAGES |
| MORRIS AND DICKSON CO LLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| MYLAN PHARMACEUTICALS INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| NORAMCO INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| NOVARTIS PHARMACEUTICALS | CORP | D | 1 | 05/29/2020 | A | DAMAGES |

<<Prev  Page 2 of 4  Next>>

New Search



**Ascension Civil Suits Search**
**Suits List**

| Surname | Given | Party Type | Suit Type | Date Filed | Div | Cause of Action |
|---|---|---|---|---|---|---|
| ORTHO MCNEIL JANSSEN PHAR | M NKA | D | 1 | 05/29/2020 | A | DAMAGES |
| PAR PHARMACEUTICAL COMPAN | IES INC FKA | D | 1 | 05/29/2020 | A | DAMAGES |
| PAR PHARMACEUTICAL HOLDIN | GS INC | D | 1 | 05/29/2020 | A | DAMAGES |
| PAR PHARMACEUTICAL INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| PREVOST MEMORIAL HOSPITAL | | P | 1 | 05/29/2020 | A | DAMAGES |
| SANDOZ INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| SPECGX LLC | | D | 1 | 05/29/2020 | A | DAMAGES |
| TEVA PHARMACEUTICAL INDUS | TRIES LTD | D | 1 | 05/29/2020 | A | DAMAGES |
| TEVA PHARMACEUTICALS US I | NC | D | 1 | 05/29/2020 | A | DAMAGES |
| WALGREEN CO | | D | 1 | 05/29/2020 | A | DAMAGES |
| WALGREENS BOOTS ALLIANCE | INC | D | 1 | 05/29/2020 | A | DAMAGES |
| WALMART INC FKA | | D | 1 | 05/29/2020 | A | DAMAGES |
| WALMART STORES INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| WARNER CHILCOTT COMPANY L | LC | D | 1 | 05/29/2020 | A | DAMAGES |
| WATSON LABORATORIES INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| WATSON LABORATORIES INC F | LORIDA | D | 1 | 05/29/2020 | A | DAMAGES |
| WATSON LABORATORIES INC S | ALT LAKE CITY | D | 1 | 05/29/2020 | A | DAMAGES |
| WATSON PHARMA INC | | D | 1 | 05/29/2020 | A | DAMAGES |
| WATSON PHARMACEUTICALS IN | C | D | 1 | 05/29/2020 | A | DAMAGES |
| WEST ASCENSION PARISH HOS | PITAL SER DBA | P | 1 | 05/29/2020 | A | DAMAGES |

<<Prev   Page 3 of 4   Next>>

**New Search**



ACCESS Main Menu | Contact Us | Land Records | Maps | Civil Suits | Criminal Records | Pending Criminal Inquiry | Marriage Licenses | Order History | Your cart contains 0 document(s) | Log Out - swilliams@bwor.com

**Ascension Civil Suits Search**
**Suits List**

| Surname | Given | Party Type | Suit Type | Date Filed | Div | Cause of Action |
|---------|-------|-----------|-----------|-----------|-----|-----------------|
| WEST WARD PHARMACEUTICAL | CORP NKA | D | 1 | 05/29/2020 | A | DAMAGES |

<<Prev   Page 4 of 4   Next>>

New Search

**TWENTY-THIRD JUDICIAL DISTRICT**
**PARISH OF ASCENSION**
**STATE OF LOUISIANA**

NO.                                                    SECTION " "

**WEST ASCENSION PARISH HOSPITAL SERVICE DISTRICT**
**D/B/A PREVOST MEMORIAL HOSPITAL**

**VERSUS**

**AMERISOURCEBERGEN DRUG CORP ORATION;MCKESSON CORPORATION; CARDINAL HEALTH, INC.; CVS HEALTH CORPORATION; CVS PHARMACY, INC., AND CVS TN DISTRIBUTION, LLC F/K/A CVS TN DISTRIBUTION, INC.; WALGREENS BOOTS ALLIANCE, INC.; WALGREEN CO.; WALMART INC. F/K/A WAL-MART STORES, INC.; LOUISIANA WHOLESALE DRUG CO., INC.; MORRIS AND DICKSON CO., LLC;ALLERGAN PLC F/K/A ACTAVIS PLC F/K/A ALLERGAN, INC.; ALLERGAN FINANCE, LLC F/K/A ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.; ALLERGAN SALES, LLC; ALLERGAN USA, INC.; WATSON LABORATORIES, INC.; WARNER CHILCOTT COMPANY, LLC; ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.; ACTAVIS SOUTH ATLANTIC LLC; ACTAVIS ELIZABETH LLC; ACTAVIS MID ATLANTIC LLC; ACTAVIS TOTOWA LLC; ACTAVIS, LLC; ACTAVIS KADIAN LLC; ACTAVIS LABORATORIES UT, INC. F/K/A WATSON LABORATORIES, INC.-SALT LAKE CITY; ACTAVIS LABORATORIES FL, INC. F/K/A WATSON LABORATORIES, INC.-FLORIDA; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; NORAMCO, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.; PAR PHARMACEUTICAL COMPANIES, INC. F/K/A PAR PHARMACEUTICAL HOLDINGS, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; SPECGX LLC; MYLAN PHARMACEUTICALS, INC.; WEST-WARD PHARMACEUTICAL CORP. N/K/A HIKMA PHARMACEUTICALS USA INC.; INDIVIOR INC.; NOVARTIS PHARMACEUTICALS CORP.; AND SANDOZ, INC.**

FILED: _____        _____
                                                    **DEPUTY CLERK**

**PETITION FOR DAMAGES**

Plaintiff, WEST ASCENSION PARISH HOSPITAL SERVICE DISTRICT D/B/A

PREVOST MEMORIAL HOSPITAL, a political subdivision of the State of Louisiana, brings this

Petition against Defendants AMERISOURCEBERGEN DRUG CORPORATION;MCKESSON

CORPORATION; CARDINAL HEALTH, INC.; CVS HEALTH CORPORATION; CVS

PHARMACY, INC., AND CVS TN DISTRIBUTION, LLC F/K/A CVS TN DISTRIBUTION,

INC.; WALGREENS BOOTS ALLIANCE, INC.; WALGREEN CO.; WALMART INC. F/K/A

WAL-MART STORES, INC.; LOUISIANA WHOLESALE DRUG CO., INC.; MORRIS AND

DICKSON CO., LLC; ~~PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE~~

~~FREDERICK COMPANY, INC.;~~ALLERGAN PLC F/K/A ACTAVIS PLC F/K/A ALLERGAN,

1

INC.; ALLERGAN FINANCE, LLC F/K/A ACTAVIS, INC. F/K/A WATSON

PHARMACEUTICALS, INC.; ALLERGAN SALES, LLC; ALLERGAN USA, INC.; WATSON

LABORATORIES, INC.; WARNER CHILCOTT COMPANY, LLC; ACTAVIS PHARMA,

INC. F/K/A WATSON PHARMA, INC.; ACTAVIS SOUTH ATLANTIC LLC; ACTAVIS

ELIZABETH LLC; ACTAVIS MID ATLANTIC LLC; ACTAVIS TOTOWA LLC; ACTAVIS,

LLC; ACTAVIS KADIAN LLC; ACTAVIS LABORATORIES UT, INC. F/K/A WATSON

LABORATORIES, INC.-SALT LAKE CITY; ACTAVIS LABORATORIES FL, INC. F/K/A

WATSON LABORATORIES, INC.-FLORIDA; TEVA PHARMACEUTICAL INDUSTRIES,

LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON &

JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN

PHARMACEUTICALS, INC. N/K/A JANSSEN PHARMACEUTICAL S, INC.; JANSSEN

PHARMACEUTICA INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; NORAMCO, INC.;

ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; PAR

PHARMACEUTICAL, INC.; PAR PHARMACEUTICAL COMPANIES, INC. F/K/A PAR

PHARMACEUTICAL HOLDINGS, INC.; ~~INSYS THERAPEUTICS, INC.;~~ MALLINCKRODT

PLC; MALLINCKRODT LLC; SPECGX LLC; MYLAN PHARMACEUTICALS, INC.; WEST-

WARD PHARMACEUTICAL CORP. N/K/A HIKMA PHARMACEUTICALS USA INC.;

INDIVIOR INC.; NOVARTIS PHARMACEUTICALS CORP.; AND SANDOZ, INC.

## INTRODUCTION

### 1.

Plaintiff, West Ascension Parish Hospital Service District d/b/a Prevost Memorial Hospital

("Plaintiff") brings this civil action to eliminate the hazard to public health and safety caused by

the opioid epidemic, to abate the nuisance caused thereby, and to recover losses resulting from

Defendants' false, deceptive and unfair marketing and/or unlawful diversion of prescription

opioids.[1] Such economic damages were foreseeable to Defendants and were sustained because of

Defendants' intentional, negligent and unlawful actions and/or omissions.

---

[1] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.

**2.**

Opioid analgesics are widely diverted and improperly used, and the widespread abuse of opioids has resulted in a national epidemic of opioid overdose deaths and addictions.[2]

**3.**

The opioid epidemic is directly related to the increasingly widespread misuse of powerful opioid pain medications.[3]

**4.**

Plaintiff brings this suit against the manufacturers of prescription opioids. The manufacturers aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction. These pharmaceutical companies aggressively advertised to and persuaded doctors to prescribe highly addictive, dangerous opioids, turning patients into drug addicts for their own corporate profit. Such actions were intentional and/or unlawful.

**5.**

Plaintiff also brings this suit against the wholesale distributors of these highly addictive drugs. The distributors and manufacturers intentionally and/or unlawfully breached their legal duties under Louisiana law to monitor, detect, investigate, refuse and report excessive or unusual orders of prescription opiates.

## PARTIES

### I.    PLAINTIFF

**6.**

West Ascension Parish Hospital Service District d/b/a Prevost Memorial Hospital is a political subdivision of the state of Louisiana, and a body corporate in law with the power to sue and be sued. La. Rev. Stat. Ann. §§ 46:1064(A), 1060, 1072.

**7.**

Plaintiff exists for the purpose of caring for the sick and injured and the promotion of the general health of the community. La. Rev. Stat. Ann. §§ 46: 1052.

---

[2] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. ENG. J. MED. 1253 (2016).
[3] *See* Robert M. Califf *et al.*, *A Proactive Response to Prescription Opioid Abuse*, 374 N. ENG. J. MED. 1480 (2016).

**8.**

The West Ascension Parish Hospital Service District's boundaries ("District") include all the territory contained within Ascension Parish, Louisiana west of the centerline of the Mississippi River ("West Ascension"). La. Rev. Stat. Ann. § 47:338.164.

**9.**

The West Ascension Parish Hospital Service District owns and operates Prevost Memorial Hospital located in the West Ascension City of Donaldsonville (est. population 8,183), Parish Seat of Ascension Parish, Louisiana (est. population 122,948).[4]

**10.**

Prevost Memorial Hospital has a 5,388 square feet, 7-bed emergency department, a 15-bed acute care facility, and a 10-bed nursing facility ("Hospital").

**11.**

Prevost Memorial Hospital provides a range of services to Plaintiff's Community, including the following:

   a. emergency department services 24 hours per day, 7 days per week, 365 days per year
   b. inpatient services
   c. out-patient services including pathology, respiratory, and radiology services; and,
   d. social and educational services.

**12.**

The citizens of West Ascension have relied on Plaintiff to provide them with medical care and services more than 60 years, and Plaintiff provides services to Ascension Parish residents outside of West Ascension and West Ascension's surrounding areas ("Plaintiff's Community").

**13.**

Opioid abuse, addiction, morbidity and mortality have created a serious public health and safety crisis, and are a public nuisance. The diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

**14.**

The distribution and diversion of opioids into Louisiana ("the State"), and into West Ascension and Plaintiff's Community, created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seeks relief.

---

[4] U.S. Census Bureau, American FactFinder, Population Estimate as of July 1, 2017, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last accessed Apr. 11, 2019).

**15.**

Plaintiff provides employee health care and injured employee medical benefits to its employees. Plaintiff spends significant sums each year to provide or pay for health care and pharmaceutical care on behalf of its employees, their spouses, and dependents, including payments for prescription opioids, which are and have been manufactured, labeled, marketed, promoted, sold, and/or distributed by the Defendants.

**16.**

Defendants' false, deceptive and unfair marketing and unlawful diversion of prescription opioids into West Ascension, the Parish, and Plaintiff's Community caused the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seek relief.

**17.**

As a direct and foreseeable consequence of Defendants' wrongful conduct, Plaintiff has been required to spend significant sums that would not have otherwise been spent in its efforts to combat the public nuisance created by Defendants' false, deceptive and unfair marketing and unlawful diversion of prescription opioids. Plaintiff has incurred and continues to incur costs related to opioid addiction and abuse. Categories of past and continuing sustained damages include *inter alia*: (1) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation; and (5) other costs associated with Plaintiff's performance of its duties to care of the sick and injured and the promotion of the general health of Plaintiff's Community. These damages have been suffered, and continue to be suffered directly, by the Plaintiff.

**18.**

Plaintiff seeks a judgment requiring all Defendants to pay restitution, damages, including multipliers of damages, disgorgement, civil penalties, attorney's fees, costs and expenses, injunctive relief, and any other relief to which Plaintiff may be entitled. Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

**19.**

Plaintiff has standing to recover damages incurred as a result of Defendants' actions and omissions.

## II.    PERSONS NOT NAMED AS DEFENDANTS

Plaintiff does not name as Defendant herein any of the following Defendants irrespective of any language in this Petition to the contrary on the basis of and subject to the fact that the following Defendants are parties to bankruptcy proceedings and courts have enjoined opioid litigants like Plaintiff from commencing proceedings against them:

    i.    Purdue Pharma L.P.; [5]

    ii.    Purdue Pharma, Inc.;

    iii.    The Purdue Frederick Company, Inc.;

    iv.    Rhodes Pharmaceuticals Inc.;

    v.    Rhodes Pharmaceuticals, L.P.;

    vi.    Insys Therapeutics, Inc. [6]

## III.    <u>DEFENDANTS</u>

### A.    <u>Manufacturer Defendants</u>

**20.**

At all relevant times, the Manufacturer Defendants, each of whom is defined below, have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs. The Manufacturer Defendants, at all times, have manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

---

[5]Purdue Pharma L.P. ("PPL") is a limited partnership organized under the laws of Delaware with its principal place of business in Stamford, Connecticut. Purdue Pharma Inc. ("PPI") is a New York corporation with its principal place of business in Stamford, Connecticut. The Purdue Frederick Company, Inc. ("PFC") is a New York corporation with its principal place of business in Stamford, Connecticut. PPL, PPI, and PFC and their registrant subsidiaries and affiliates (collectively, "Purdue") were engaged in the manufacture, promotion, distribution, and sale of opioids nationally, and in Ascension Parish, including West Ascension. OxyContin was Purdue's largest-selling opioid. In September 2019, Purdue Pharma L.P. and 23 affiliated debtors each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, Case No. 19-23649. Claims are enjoined against debtors and related parties, including the following :Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Rhodes Pharmaceuticals Inc.; Rhodes Pharmaceuticals, L.P..

[6] Insys Therapeutics, Inc. is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys's principal product and source of revenue is Subsys. Subsys is a transmucosal immediate-release formulation (TIRF) of fentanyl, contained in a single-dose spray device intended for oral, under-the-tongue administration. Subsys was approved by the FDA solely for the treatment of breakthrough cancer pain. In 2016, Insys made approximately $330 million in net revenue from Subsys. Insys promotes, sells, and distributes Subsys throughout the United States, and in Ascension Parish, including West Ascension. On June 10, 2019, Insys Therapeutics, Inc. and six (6) affiliated companies filed petitions in the United States Bankruptcy Court for the District of Delaware Case, No. 19-11292, seeking relief under chapter 11 of the United States Bankruptcy Code.

### 1. **Actavis Entities**

#### 21.

Defendant Allergan plc (f/k/a Actavis plc, f/k/a Allergan, Inc.) is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland, and its administrative headquarters and all executive officers located in Madison, New Jersey. In October 2012, the Actavis Group was acquired by Watson Pharmaceuticals, Inc., and the combined company changed its name to Actavis, Inc. as of January 2013, and then to Actavis plc in October 2013. In October 2013, Actavis plc (n/k/a Allergan plc) acquired Warner Chilcott plc pursuant to a transaction agreement dated May 19, 2013. Actavis plc (n/k/a Allergan plc) was established to facilitate the business combination between Actavis, Inc. (n/k/a Allergan Finance, LLC) and Warner Chilcott plc. Following the consummation of the October 1, 2013 acquisition, Actavis, Inc. (n/k/a Allergan Finance, LLC Inc.) and Warner Chilcott plc became wholly-owned subsidiaries of Actavis plc (n/k/a Allergan plc). Pursuant to the transaction, each of Actavis, Inc.'s common shares was converted into one Actavis plc share. Further, Actavis plc (n/k/a Allergan plc) was the "successor issuer" to Actavis, Inc. and Warner Chilcott. Actavis plc acquired Allergan, Inc. in March 2015, and the combined company thereafter changed its name to Allergan plc.[7]

#### 22.

Defendant Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. is a limited liability company incorporated in Nevada and headquartered in Madison, New Jersey. Allergan Finance, LLC is a wholly-owned subsidiary of defendant Allergan plc. In 2008, Actavis, Inc. (n/k/a Allergan Finance, LLC), acquired the opioid Kadian through its subsidiary, Actavis Elizabeth LLC, which had been the contract manufacturer of Kadian since 2005. Since 2008, Kadian's label has identified the following entities as the manufacturer or distributor of Kadian: Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Pharma, Inc., and Allergan USA, Inc. Currently, Allergan USA, Inc. is contracted with UPS SCS, Inc. to distribute Kadian on its behalf.

#### 23.

Defendant Allergan Sales, LLC is incorporated in Delaware, headquartered in

---

[7] The transaction that created Actavis plc converted each share of Actavis Inc.'s Class A common shares into one Actavis plc Ordinary Share. *See City of Chicago v. Purdue Pharma L.P.*, et al. (N.D. Ill. 2015), No. 14-4361, 2015 WL 2208423, at *7. Actavis Inc. and Actavis plc had the same corporate headquarters both before and after the merger; Actavis plc had the same website as Actavis Inc.; and, Actavis plc maintained all of Actavis Inc.'s officers in the same positions. *See id.* Actavis plc's SEC filings explained that "references throughout to 'we,' 'our,' 'us,' the 'Company' or 'Actavis' refer interchangeably to Watson Pharmaceuticals, Inc., Actavis, Inc., and Actavis plc depending on the date." *See City of Chicago v. Purdue Pharma L.P.*, et al. (N.D. Ill. 2015), No. 14-4361, 2015 WL 2208423, at *7.

Irvine, California, and registered to do business in the State of Louisiana. Allergan Sales, LLC is the current New Drug Application ("NDA") holder for Kadian, and in 2016, Allergan Sales, LLC held the Abbreviated New Drug Applications ("ANDAs") for Norco.[8] Allergan Sales, LLC is the wholly-owned subsidiary of Allergan plc.

24.

Defendant Allergan USA, Inc. is incorporated in Delaware, headquartered in Madison, New Jersey, and is registered to do business in the state of Louisiana. Allergan USA, Inc. is currently responsible for Norco and Kadian sales. Allergan USA, Inc. is a wholly-owned subsidiary of Allergan plc.

25.

Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California. Watson Laboratories, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva. Prior to the sale, Watson Laboratories, Inc. was a direct subsidiary of Actavis, Inc., (n/k/a Allergan Finance, LLC). Between 2000 and 2015, Watson Laboratories, Inc. held the ANDAs for Norco and was the manufacturer of the drug. Watson Laboratories, Inc. was also the ANDA holder of various generic opioids.

26.

Defendant Warner Chilcott Company, LLC is a limited liability company incorporated in Puerto Rico. Since 2015, Warner Chilcott Company, LLC has been the manufacturer of Norco. Warner Chilcott Company, LLC was a subsidiary of Warner Chilcott plc until Warner Chilcott plc became a wholly owned subsidiary of Allergan plc in 2013. Warner Chilcott Company LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

27.

Defendant Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) is a Delaware corporation with its principal place of business in New Jersey. Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) was previously responsible for sales of Kadian and Norco. Actavis Pharma, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses

---

[8] The Norco ANDAs are currently held by Allergan Pharmaceuticals International Limited, which is incorporated in Ireland.

8

to Teva.

**28.**

Defendant Actavis South Atlantic LLC is a Delaware limited liability company with its principal place of business in Sunrise, Florida. Actavis South Atlantic LLC was listed as the ANDA holder for oxymorphone and fentanyl transdermal. Actavis South Atlantic LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

**29.**

Defendant Actavis Elizabeth LLC is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. From December 19, 2005, until it purchased the medication in December 2008, Actavis Elizabeth LLC served as the contract manufacturer of Kadian for Alpharma. Actavis Elizabeth LLC held the NDA for Kadian from 2008 to 2013. Actavis Elizabeth LLC was also the holder of ANDAs for the following Schedule II opioid products: oxycodone/acetaminophen; homatropine methylbromide/hydrocodone bitartrate; morphine sulfate capsule; morphine sulfate tablet; oxycodone/hydrochloride tablet; oxycodone/ibuprofen; and oxymorphone tablet. Actavis Elizabeth LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

**30.**

Defendant Actavis Mid Atlantic LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis Mid Atlantic LLC has held the ANDA for homatropine methylbromide/hydrocodone bitartrate. Actavis Mid Atlantic LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

**31.**

Defendant Actavis Totowa LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Actavis Totowa LLC has held the ANDAs for the following Schedule II opioid products: oxycodone/acetaminophen; homatropine methylbromide; oxycodone/hydrochloride.

**32.**

Defendant Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Defendants Actavis South Atlantic LLC, Actavis Elizabeth

LLC, Actavis Mid Atlantic LLC, and Actavis Totowa LLC were all direct subsidiaries of Actavis LLC, which was an indirect subsidiary of defendant Watson Laboratories, Inc. Watson Laboratories, Inc., in turn, was a direct subsidiary of Actavis, Inc. (n/k/a Allergan Finance, LLC). Actavis LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

**33.**

Defendant Actavis Kadian LLC is a Delaware limited liability company with its principal place of business in Morristown, New Jersey. Actavis Kadian LLC has been identified on Kadian's label as a manufacturer or distributor of Kadian. Actavis Kadian LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

**34.**

Defendant Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City) is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah. Actavis Laboratories UT, Inc. was the Kadian NDA holder from 2013 to 2016 and was listed as the NDA holder for morphine sulfate capsule. Actavis Laboratories UT, Inc. was sold to Teva Pharmaceutical Industries Limited as part of Allergan plc's 2016 sale of its generic businesses to Teva. Prior to the sale, Actavis Laboratories UT, Inc. was a direct subsidiary of Actavis, Inc. (n/k/a Allergan Finance, LLC).

**35.**

Defendant Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida) is a Florida limited liability company with its principal place of business in Davie, Florida. Actavis Laboratories FL, Inc. was a Norco ANDA holder in 2015 and was the ANDA holder of the following Schedule II opioid products: hydrocodone/acetaminophen; hydrocodone/ibuprofen; oxycodone/aspirin; and hydromorphone tablet. Actavis Laboratories FL, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva. Prior to the sale, Actavis Laboratories FL, Inc. was a direct subsidiary of Andrx Corporation, which was a direct subsidiary of Actavis, Inc.. (n/k/a Allergan Finance, LLC). Andrx Corporation was transferred to Teva as part of the 2016 sale.

**36.**

Each of these defendants and entities currently is or was previously owned by Defendant Allergan plc, which uses them to market and sell its drugs in the United States. Collectively, these

defendants and entities, and their Registrant subsidiaries and affiliates that manufacture, promote, distribute, and sell prescription opioids, are referred to as "Actavis."

### 37.

Actavis manufactures or has manufactured the following drugs as well as generic versions of Kadian, Duragesic, and Opana in the United States:

| Product Name | Chemical Name | Schedule |
|---|---|---|
| Kadian | Morphine sulfate, extended release | Schedule II |
| Norco | Hydrocodone bitartate and acetaminophen | Schedule II |

### 38.

In August 2016 Actavis's global generics business was acquired by Teva Pharmaceutical Industries Ltd.[9]

### 2. **Cephalon Entities**

### 39.

Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva USA was in the business of selling generic opioids, including a generic form of OxyContin from 2005 to 2009. Teva USA is a wholly-owned subsidiary of Defendant Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), an Israeli corporation (collectively, "Teva").

### 40.

Defendant Cephalon, Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired Cephalon, Inc.

### 41.

Teva USA and Cephalon, Inc. and their Registrant subsidiaries and affiliates (collectively, "Cephalon") work together to manufacture, promote, distribute and sell both brand name and generic versions of opioids in the United States and in Ascension Parish, including West Ascension, including the following:

| Product Name | Chemical Name | Schedule |
|---|---|---|
| Actiq | Fentanyl citrate | Schedule II |
| Fentora | Fentanyl buccal | Schedule II |

---

[9] Allergan plc, Annual Report (Form 10 K), 3 (Feb. 16, 2018), https://www.sec.gov/Archives/edgar/data/1578845/000156459018002345/agn105_20171231.htm.

11

### 3. **Janssen Entities**

**42.**

Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

**43.**

Defendant Janssen Pharmaceuticals, Inc. ("Janssen Pharmaceuticals") is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly-owned subsidiary of J&J. J&J corresponds with the FDA regarding Janssen's products. Janssen Pharmaceuticals, Inc. formerly was known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc.

**44.**

Defendant Noramco, Inc. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J and its manufacturer of active pharmaceutical ingredients until July 2016 when J&J sold its interests to SK Capital.

**45.**

Defendant Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("OMP"), now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

**46.**

Defendant Janssen Pharmaceutica, Inc. ("Janssen Pharmaceutica"), now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

**47.**

J&J, Janssen Pharmaceuticals, OMP, and Janssen Pharmaceutica and their Registrant subsidiaries and affiliates (collectively, "Janssen") are or have been engaged in the manufacture, promotion, distribution, and sale of opioids nationally, and in Ascension Parish, including West Ascension. Among the drugs Janssen manufactures or manufactured are the following:

| Product Name | Chemical Name | Schedule |
| --- | --- | --- |
| Duragesic | Fentanyl | Schedule II |

12

| Nucynta[10] | Tapentadol hydrochloride, immediate release | Schedule II |
| Nucynta ER | Tapentadol hydrochloride, extended release | Schedule II |

**48.**

Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

**4. Endo Entities**

**49.**

Defendant Endo Health Solutions Inc. ("EHS") is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

**50.**

Defendant Endo Pharmaceuticals, Inc. ("EPI") is a wholly-owned subsidiary of EHS and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

**51.**

Defendant Par Pharmaceutical, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. Defendant Par Pharmaceuticals Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York (Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. collectively, "Par Pharmaceutical"). Par Pharmaceutical was acquired by Endo International plc in September 2015 and is an operating company of Endo International plc. EHS, EPI, and Par Pharmaceutical, and their Registrant subsidiaries and affiliates (collectively, "Endo") manufacture opioids sold nationally, and in Plaintiff's community. Among the drugs Endo manufactures or manufactured are the following:

| Product Name | Chemical Name | Schedule |
| --- | --- | --- |
| Opana ER | Oxymorphone hydrochloride, extended release | Schedule II |
| Opana | Oxymorphone hydrochloride | Schedule II |
| Percodan | Oxymorphone hydrochloride and aspirin | Schedule II |
| Percocet | Oxymorphone hydrochloride and acetaminophen | Schedule II |
| Generic | Oxycodone | Schedule II |

---

[10]Depomed, Inc. acquired the rights to Nucynta and Nucynta ER from Janssen in 2015.

| Generic | Oxymorphone | Schedule II |
| Generic | Hydromorphone | Schedule II |
| Generic | Hydrocodone | Schedule II |

**52.**

Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012, accounting for over 10% of Endo's total revenue; Opana ER yielded revenue of $1.15 billion from 2010 to 2013. Endo also manufactures and sells generic opioids, both directly and through its subsidiaries, Par Pharmaceutical and Qualitest Pharmaceuticals, Inc., including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

**5. Mallinckrodt Entities**

**53.**

Defendant Mallinckrodt plc is an Irish public limited company with its headquarters in Staines-Upon-Thames, Surrey, United Kingdom. Mallinckrodt plc was incorporated in January 2013 for the purpose of holding the pharmaceuticals business of Covidien plc, which was fully transferred to Mallinckrodt plc in June of that year. Mallinckrodt plc also operates under the registered business name Mallinckrodt Pharmaceuticals, with its U.S. headquarters in Hazelwood, Missouri.

**54.**

Defendant Mallinckrodt LLC is a Delaware corporation with its headquarters in Hazelwood, Missouri.

**55.**

Defendant SpecGx LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri and is a wholly-owned subsidiary of Mallinckrodt plc.

**56.**

Mallinckrodt plc, Mallinckrodt LLC, and SpecGx LLC and their registrant subsidiaries and affiliates (together, "Mallinckrodt") manufacture, market, sell and distribute pharmaceutical drugs throughout the United States, and in West Ascension and Ascension Parish, Louisiana.

**57.**

Mallinckrodt is the largest U.S. supplier of opioid pain medications.

**58.**

Mallinkrodt is among the top ten generic pharmaceutical manufacturers in the United

14

States, based on prescriptions.

**59.**

Mallinckrodt manufactures and markets two branded opioids: Exalgo, which is extended-release hydromorphone, sold in 8, 12, 16, and 32 mg dosage strengths, and Roxicodone, which is oxycodone, sold in 15 and 30 mg dosage strengths. In 2009, Mallinckrodt Inc., a subsidiary of Covidien plc, acquired the U.S. rights to Exalgo. The FDA approved Exalgo for treatment of chronic pain in 2012. Mallinckrodt further expanded its branded opioid portfolio in 2012 by purchasing Roxicodone from Xanodyne Pharmaceuticals. In addition, Mallinckrodt developed Xartemis XR, an extended-release combination of oxycodone and acetaminophen, which the FDA approved in March 2014, and which Mallinckrodt has since discontinued. Mallinckrodt promoted its branded opioid products with its own direct sales force.

**60.**

Mallinckrodt operates a vertically integrated business in the United States: (1) importing raw opioid materials, (2) manufacturing generic opioid products, primarily at its facility in Hobart, New York, and (3) marketing and selling its products to drug distributors, specialty pharmaceutical distributors, retail pharmacy chains, pharmaceutical benefit managers that have mail-order pharmacies, and hospital buying groups.

**61.**

Among the drugs Mallinckrodt manufactures or has manufactured are the following:

| Product Name | Chemical Name | Schedule |
|---|---|---|
| Exalgo | Hydromorphone hydrochloride, extended release | Schedule II |
| Roxicodone | Oxycodone hydrochloride | Schedule II |
| Xartemis XR | Oxycodone hydrochloride and acetaminophen | Schedule II |
| Methadose | Methadone hydrochloride | Schedule II |
| Generic | Morphine sulfate, extended release | Schedule II |
| Generic | Morphine sulfate oral solution | Schedule II |
| Generic | Fentanyl transdermal system | Schedule II |
| Generic | Oral transmucosal fentanyl citrate | Schedule II |
| Generic | Oxycodone and acetaminophen | Schedule II |
| Generic | Hydrocodone bitartrate and acetaminophen | Schedule II |
| Generic | Hydromorphone hydrochloride | Schedule II |
| Generic | Hydromorphone hydrochloride, extended release | Schedule II |
| Generic | Naltrexone hydrochloride | unscheduled |
| Generic | Oxymorphone hydrochloride | Schedule II |
| Generic | Methadone hydrochloride | Schedule II |

| Generic | Oxycodone hydrochloride | Schedule II |
| Generic | Buprenorphine and naloxone | Schedule III |

### 6. **Mylan Pharmaceuticals, Inc.**

**62.**

Defendant, Mylan Pharmaceuticals, Inc. ("Mylan"), is a West Virginia corporation with principal places of business in Canonsburg, Pennsylvania or Morgantown, West Virginia. Mylan Pharmaceuticals, Inc. is registered to do business in the state of Louisiana with a principal office in Baton Rouge, Louisiana. At relevant times, Mylan has maintained distributer licenses with the Louisiana Board of Pharmacy and Louisiana Board of Drug and Device Distributors.

**63.**

At all relevant times, Defendant Mylan manufactured, labeled, marketed, packaged, distributed, supplied, and/or sold, prescription opioids, including fentanyl and morphine shipped to Louisiana, including Ascension Parish, including West Ascension, and otherwise placed prescription opioids into the stream of commerce into this jurisdiction, in violation of the duties owed to Plaintiff as set forth throughout this Petition.

### 7. **Hikma**

**64.**

Defendant West-Ward Pharmaceutical Corp. n/k/a Hikma Pharmaceuticals USA Inc.("Hikma") is a Delaware corporation with its principal place of business located in Eatontown, New Jersey. West-Ward Pharmaceutical Corp. n/k/a Hikma Pharmaceuticals USA Inc. is the United States agent and subsidiary of Hikma Pharmaceuticals plc, a London-based global pharmaceutical company. Hikma Pharmaceuticals plc entered the U.S. market when it acquired West-Ward Pharmaceuticals Corp. more than 20 years ago. Hikma Pharmaceuticals plc operated the company as West-Ward Pharmaceuticals Corp. until recently, when it began to operate the company as Hikma Pharmaceuticals USA Inc. Hikma Pharmaceuticals USA Inc. is a licensed controlled dangerous substance manufacturer and a licensed controlled dangerous substance distributer in the state of Louisiana.

**65.**

At all relevant times, Hikma has manufactured, labeled, marketed, packaged, distributed, supplied, and/or sold, prescription opioids, including methadone shipped to Louisiana, including Ascension Parish, including West Ascension, and otherwise placed prescription opioids into the

stream of commerce into this jurisdiction, in violation of the duties owed to Plaintiff as set forth throughout this Petition.

8. **Indivior**

66.

Defendant Indivior Inc. is a Delaware domestic corporation with its principal place of business in Richmond, Virginia and registered to do business in the state of Louisiana. Indivior Inc. is a subsidiary of Indivior, plc, based in the United Kingdom. Indivior, plc was demerged from Reckitt Benckiser Group plc in 2014 or 2015.

67.

Indivior, Inc. manufactures and distributes buprenorphine-based prescription drugs for the treatment of opioid dependence. Buprenorphine is a schedule III drug. The company offers opioid medication under the brand name Suboxone and sublingual tablets under the brand name Subutex.

68.

At all relevant times, Indivior, Inc. has manufactured, labeled, marketed, packaged, distributed, supplied, and/or sold, prescription opioids, including buprenorphine shipped to Louisiana, including Ascension Parish, including West Ascension, and otherwise and otherwise placed prescription opioids into the stream of commerce into this jurisdiction, in violation of the duties owed to Plaintiff as set forth throughout this Petition.

9. **Sandoz**

69.

Sandoz, Inc. is a division of Novartis Pharmaceuticals Corp. with its headquarters located in Princeton, New Jersey. Novartis Pharmaceuticals Corporation is a Delaware corporation with its headquarters located in East Hanover, New Jersey. Novartis Pharmaceuticals Corporation was formerly known as Sandoz Pharmaceuticals Corporation (1998), which was formerly known as Sandoz, Inc. (1987).

70.

Novartis Pharmaceuticals Corp. is registered to do business in the state of Louisiana. Sandoz, Inc. and Novartis Pharmaceuticals Corporation each maintain separate licenses with the Louisiana Board of Drug and Device Distributors with the same distribution location in Mechanicsburg, Pennsylvania and have previously maintained controlled and dangerous licenses with the Louisiana Board of Pharmacy

71.

At all relevant times, Sandoz Inc. and Novartis Pharmaceutical Corp. (collectively referred to herein as "Sandoz") has manufactured, marketed, labeled, packaged, distributed, supplied, and/or sold, prescription opioids shipped to Louisiana, including Washington Parish, and otherwise placed prescription opioids into the stream of commerce into this jurisdiction, in violation of the duties owed to Plaintiff as set forth throughout this Petition.

72.

Collectively, Actavis, Cephalon, Janssen, Endo, and Mallinckrodt, as well as Mylan, Hikma, Indivior, and Sandoz are referred to as "Manufacturer Defendants."

**B. Distributor Defendants**

73.

The Distributor Defendants are defined below. At all relevant times, the Distributor Defendants have distributed, supplied, sold, and placed into the stream of commerce the prescription opioids, without fulfilling their duties required by law to detect and warn of diversion of dangerous drugs for non-medical purposes. The Distributor Defendants are engaged in wholesale distribution, as defined under law. The unlawful conduct by the Distributors is responsible for the volume of prescription opioids plaguing the Parish and Plaintiff's Community.

**1. McKesson**

74.

McKesson Corporation ("McKesson"), through its various Registrant subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs, licensed as a distributer by the Louisiana Board of Pharmacy and Louisiana Board of Drug and Device Distributors, that at all relevant times has distributed opioids throughout the country, including in West Ascension and Ascension Parish, Louisiana and Plaintiff's community. McKesson is fifth on the list of Fortune 500 companies with annual revenue of $191 billion in 2016. McKesson is incorporated in Delaware, with its principal place of business in San Francisco, California. McKesson operates a distribution center in St. Rose, Louisiana.

**2. Cardinal**

75.

Cardinal Health, Inc. ("Cardinal"), through its various Registrant subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs, licensed as a distributer by the Louisiana Board

of Pharmacy and Louisiana Board of Drug and Device Distributors, that at all relevant times has distributed opioids throughout the country, including in West Ascension and Ascension Parish, Louisiana and Plaintiff's community. Cardinal is the fifteenth largest company by revenue in the U.S., with annual revenue of $121 billion in 2016. Cardinal is an Ohio corporation headquartered in Dublin, Ohio and registered to do business in the state of Louisiana.

### 3.  **AmerisourceBergen**

#### 76.

AmerisourceBergen Drug Corporation ("AmerisourceBergen"), through its various Registrant subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs, licensed as a distributer by the Louisiana Board of Pharmacy and Louisiana Board of Drug and Device Distributors, that at all relevant times has distributed opioids throughout the country, including in West Ascension and Ascension Parish, Louisiana and Plaintiff's community. AmerisourceBergen is the eleventh largest company by revenue in the United States, with annual revenue of $147 billion in 2016.  AmerisourceBergen's principal place of business is located in Chesterbrook, Pennsylvania, and it is incorporated in Delaware. AmerisourceBergen's registered to do business in the state of Louisiana.

#### 77.

Together, AmerisourceBergen Drug Corporation, McKesson Corporation and Cardinal Health, Inc. dominate 85% of the market share for the distribution of prescription opioids

### 4.  **CVS**

#### 78.

CVS HEALTH CORPORATION  is a Delaware corporation with its principal place of business in Rhode Island.

#### 79.

CVS PHARMACY, INC. is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island and registered to do business in the State of Louisiana. CVS Pharmacy, Inc. operates as a subsidiary of CVS Health Corporation. At relevant times, CVS Pharmacy, Inc. maintained distributer licenses with the Louisiana Board of Pharmacy and Louisiana Board of Drug and Device Distributors. Defendant CVS Pharmacy, Inc. is an officer of Defendant CVS TN Distribution, LLC f/k/a CVS TN Distribution, Inc.

**80.**

CVS TN DISTRIBUTION, LLC f/k/a CVS TN Distribution, Inc. is a Tennessee corporation with its principal place of business in Woonsocket, Rhode Island and registered to do business in the State of Louisiana. At relevant times, CVS TN Distribution, LLC maintained distributer licenses with the Louisiana Boards of Pharmacy and Drug and Device Distributors.

**81.**

Collectively, Defendants CVS Health Corporation, CVS Pharmacy, Inc., and CVS TN Distribution, LLC f/k/a CVS TN Distribution, Inc., are referred to as "CVS."

**82.**

CVS, through its various registrant subsidiaries and affiliated entities, has at all relevant times conducted business as a licensed wholesale distributor. At all relevant times, CVS distributed prescription opioids throughout the United States, including, upon information and belief, in West Ascension, Ascension Parish, Louisiana and Plaintiff's Community.

### 5. **Walgreens**

**83.**

Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation with its principal place of business in Illinois.  Defendant Walgreen Co. is an Illinois corporation with its principal place of business in Illinois.  Defendants Walgreens Boots Alliance, Inc. and Walgreen Co. are collectively referred to as "Walgreens."

**84.**

Walgreens, through its various registrant subsidiaries and affiliated entities, conducts business as a license wholesale distributor. At relevant times, Walgreens, through its various registrant subsidiaries and affiliated entities, has maintained distributer licenses with the Louisiana Board of Pharmacy and Louisiana Board of Drug and Device Distributors.

**85.**

At all times relevant, Walgreens distributed prescription opioids throughout the United States, including, upon information and belief, in West Ascension and Ascension Parish, Louisiana and Plaintiff's Community.

### 6. **Walmart**

**86.**

Defendant Walmart Inc. f/k/a Wal-Mart Stores, Inc. ("Walmart"), is a Delaware

corporation with its principal place of business in Arkansas. Walmart, through its various registrant

subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all

times relevant, Walmart distributed prescription opioids throughout the United States, including,

upon information and belief, in West Ascension and Ascension Parish, Louisiana and Plaintiff's

Community.

### 7. Louisiana Wholesale Drug

**87.**

Defendant Louisiana Wholesale Drug Co., Inc. ("Louisiana Wholesale Drug") is a

Louisiana corporation with its principal place of business in Sunset, Louisiana. Louisiana

Wholesale Drug is a wholesale pharmaceutical distributor licensed by the Louisiana Board of Drug

and Device Distributors and the Louisiana Board of Pharmacy.

**88.**

At all times relevant, Louisiana Wholesale Drug, as a registrant or through its registrant

subsidiaries and its affiliate entities, was in the business of distributing and redistributing

prescription opioids through the United States, upon information and belief, in West Ascension

and Ascension Parish, Louisiana and Plaintiff's Community.

### 8. Morris & Dickson

**89.**

Defendant Morris & Dickson Co., L.L.C. ("M&D") is a Louisiana Limited Liability

Company with its principal place of business and domicile in Shreveport, Bossier Parish,

Louisiana. Morris & Dickson Co., L.L.C. was formed on or about June 20, 2003 as the survivor

of a merger with Morris & Dickson Company, Limited (est. 1918),[11] which was the survivor of a

merger with Spark Drug, Inc. (est. 1971) of New Orleans on or about 11/4/1999. Morris & Dickson

Co., L.L.C. continues to do business as Spark Drug, Inc. and operate Spark Drug, LLC's former

Greater New Orleans facility as a hub, although its main facility is at the Port of Shreveport,

Louisiana, where it has a massive 20,000 square foot vault for Schedule II drugs.

**90.**

Morris & Dickson Co., L.L.C. is a privately held wholesale prescription distributer. M&D

claims to distribute over 1% of total pharmaceutical sales in the United States. Like the Big Three

---

[11] On or about the same date, 6/20/2003, a separate entity MORRIS & DICKSON , L.L.C. (est. 2001), changed its name. That entity, Southwest Pharmaceutical Supply, L.L.C. F/K/A Morris And Dickson Of Louisiana, L.L.C. (3/24/2004) F/K/A Morris & Dickson, L.L.C.: (6/20/2003) Was ultimately dissolved on or about 10/31/2009.

Distributers, M&D is a full-line distributer. M&D is a primary distributer for most of its customers. Morris & Dickson Co., L.L.C. distributes to three types of pharmacies: retail, hospital and health systems, and alternate care (e.g., hospices, nursing homes). Morris & Dickson Co., L.L.C. is primary distributer to roughly 600 retail pharmacies and is secondary distributer to roughly 200 pharmacies. At relevant times, Morris & Dickson Co., L.L.C., through its various registrant subsidiaries and affiliated entities, including entities in Shreveport, New Orleans, and Jefferson have maintained distributer licenses with the Louisiana Board of Pharmacy and Louisiana Board of Drug and Device Distributors.

91.

Defendants McKesson, Cardinal, AmerisourceBergen, CVS, Walgreens, Walmart, Louisiana Wholesale Drug, and Morris & Dickson are collectively referred to as the "Distributor Defendants."

92.

Defendants include the above referenced entities as well as their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.

## II. AGENCY AND AUTHORITY

93.

All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## JURISDICTION AND VENUE

94.

This Court has jurisdiction over this action pursuant to the Louisiana Code of Civil Procedure articles 2 and 6 and Louisiana Revised Statute §13:3201. Defendants carry on a continuous and systematic part of their general business within Louisiana, have transacted substantial business with Louisiana entities and residents, and have caused harm in Louisiana as a result of the specific business activities complained of herein.

**95.**

Venue is proper in Ascension Parish, because Plaintiff's losses and damages were sustained and will continue to be sustained in Ascension Parish. La. Code Civ. Proc. arts. 42, 73, 74.

**96.**

This action is not removable because it presents no substantial federal question and lacks complete diversity of citizenship, given that Defendants Morris & Dickson Co., LLC and Louisiana Wholesale Drug Co., Inc. are citizens of the State of Louisiana.

## FACTUAL BACKGROUND

### I. THE OPIOID EPIDEMIC

#### A. The National Opioid Epidemic

**97.**

The past two decades have been characterized by increasing abuse and diversion of prescription drugs, including opioid medications, in the United States. [12] It's an epidemic. [13]

**98.**

Prescription opioids have become widely prescribed. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month. [14] The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population. [15]

**99.**

The number of deaths due to prescription opioid overdose is unacceptable.

a. Prescription opioids, heroin, and fentanyl killed more than 42,000 people in 2016, more than any year on record. [16] 40% of all opioid overdose deaths involve a prescription opioid. [17]
b. The death toll from overdoses of prescription painkillers has more than tripled in the past decade. [18]

---

[12] *See* Richard C. Dart *et al.*, Trends in Opioid Analgesic Abuse and Mortality in the United States, 372 N. Eng. J. Med. 241 (2015).

[13] President Donald J. Trump, State of the Union Address (Jan 30, 2018); President Barrack Obama, Proclamation No. 9499, 81 Fed. Reg. 65,173 (Sept. 16, 2016) (proclaiming "Prescription Opioid and Heroin Epidemic Awareness Week"); Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[14] Katherine M. Keyes et al., Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States, 104 Am. J. Pub. Health e52 (2014).

[15] 14 *See* Robert M. Califf *et al.*, A Proactive Response to Prescription Opioid Abuse, 374 N. Eng. J. Med. 1480 (2016).

[16] Center for Disease Control and Prevention, Opioid Overdose, https://www.cdc.gov/drugoverdose/index.html.

[17] Center for Disease Control and Prevention, Opioid Overdose, https://www.cdc.gov/drugoverdose/index.html.

[18] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

c. More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana). [19]

d. Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined. [20]

e. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year. [21]

f. Drug overdose deaths nearly tripled during 1999–2014. Among 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid. [22]

g. Every day, more than 90 Americans lose their lives after overdosing on opioids. [23]

h. The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years. [24]

i. Every day brings a new revelation regarding the depth of the opioid plague: just to name one example, the New York Times reported in September 2017 that the epidemic, which now claims 60,000 lives a year, is now killing babies and toddlers because ubiquitous, deadly opioids are "everywhere" and mistaken as candy. [25]

j. The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years. [26]

**100.**

The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older—a total of 12 million people—reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999. [27] Almost 5,500 people start to misuse prescription painkillers every day. [28]

**101.**

---

[19] *Id.*

[20] *Id.*

[21] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf.

[22] *See* Rose A. Rudd *et al.*, Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015, 65 Morbidity & Mortality Wkly. Rep. 1445 (2016).

[23] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis, last visited Sept. 19, 2017) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, David F, Scholl L, *Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015*, MMWR MORB MORTAL WKLY REP. 2016;65, doi:10.15585/mmwr.mm655051e1).

[24] *See* **Nora** D. Volkow & A. **Thomas** McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

[25] Julie Turkewitz, *'The Pills are Everywhere': How the Opioid Crisis Claims Its Youngest Victims*, N.Y. Times, Sept. 20, 2017 ("'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

[26] *See* Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

[27] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[28] *Id.*

The United States Center for Disease Control ("CDC") has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin. [29] Heroin is pharmacologically similar to prescription opioids. The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use. [30] The CDC reports that drug overdose deaths involving heroin continued to climb sharply, with heroin overdoses more than tripling in 4 years. This increase mirrors large increases in heroin use across the country and has been shown to be closely tied to opioid pain reliever misuse and dependence. Past misuse of prescription opioids is the strongest risk factor for heroin initiation and use, specifically among persons who report past-year dependence or abuse. Increased availability of heroin, combined with its relatively low price (compared with diverted prescription opioids) and high purity appear to be major drivers of the upward trend in heroin use and overdose. [31]

### 102.

The societal costs of prescription drug abuse are huge. Misuse and addiction to opioids are "a serious national crisis that affects public health as well as social and economic welfare." [32] The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures. [33]

### 103.

While the epidemic of prescription pain medication and heroin deaths is devastating families and communities across the country, [34] the manufacturers and distributors of prescription opioids extract billions of dollars of revenue from the addicted American public while public entities experience hundreds of millions of dollars of damage—if not more—caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic. The prescription opioid manufacturers and distributors, including the Defendants, have continued their

---

[29] See Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Today's Heroin Epidemic, https://www.cdc.gov/vitalsigns/heroin/index.html (last updated July 7, 2015).
[30] See Wilson M. Compton, Relationship Between Nonmedical Prescription-Opioid Use and Heroin, 374 N. Eng. J. Med. 154 (2016).
[31] See Rose A. Rudd *et al.*, *Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014*, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016).
[32] Opioid Crisis, NIH.
[33] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, *The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States*, 2013, MED CARE 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).
[34] See Presidential Memorandum – Addressing Prescription Drug Abuse and Heroin Use, 2015 Daily Comp. Pres. Doc. 743 (Oct. 21, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500743/pdf/DCPD-201500743.pdf.

wrongful, intentional, and unlawful conduct, despite their knowledge that such conduct is causing and/or contributing to the national, state, and local opioid epidemic.

### B. Louisiana Opioid Epidemic

#### 104.

Louisiana has been especially ravaged by the national opioid crisis.

#### 105.

In 2016, Louisiana suffered 531 opioid overdoses,[35] among 996 total drug overdoses.[36]

#### 106.

In Louisiana, opioid overdoses have increased absolutely and relative to the total number of drug overdoses. Louisiana's rate of deaths with opioids present[37] and drug overdose death rates[38] both increased at an increasing rate from 2014-2016.[39] Louisiana's rate of deaths with opioids present has risen each year since 2012.[40]

#### 107.

In 2016, Louisiana had the fifth highest opioid prescribing rate in the country.[41] Louisiana averaged more than one opioid prescription per capita from 2014-2016,[42] and each year since 2006.[43] In Louisiana, 1.08 to 1.22 opioid prescriptions are written per capita each year.[44]

#### 108.

Neonatal Abstinence Syndrome (NAS), a collection of symptoms newborn babies experience withdrawing from opioid medications taken by the mother, quadrupled in Louisiana from 2003-2013, and related Medicaid expenditures increased six-fold from $1.3 million to $8.7

---

[35] Louisiana Department of health, Opioid-related Deaths in Louisiana (Nov. 9, 2017), http://ldh.la.gov/assets/opioid/OpioidDeathFactJan2018.pdf.
[36] Centers for Disease Control and Prevention, Drug Overdose Death Data, 2014-2015 Death Increases, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last visited Dec. 19, 2017).
[37] Louisiana Department of health, Opioid-related Deaths in Louisiana (Nov. 9, 2017), http://ldh.la.gov/assets/opioid/OpioidDeathFactJan2018.pdf.
[38] Centers for Disease Control and Prevention, Drug Overdose Death Data, 2014-2015, 2015-2016 Death Increases, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last visited Dec. 19, 2017).
[39] Centers for Disease Control and Prevention, Drug Overdose Death Data, 2014-2015, 2015-2016 Death Increases, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last visited Dec. 19, 2017); Louisiana Department of health, Opioid-related Deaths in Louisiana (Nov. 9, 2017), http://ldh.la.gov/assets/opioid/OpioidDeathFactJan2018.pdf
[40] Louisiana Department of health, Opioid-related Deaths in Louisiana (Nov. 9, 2017), http://ldh.la.gov/assets/opioid/OpioidDeathFactJan2018.pdf.
[41] Centers for Disease Control and Prevention, U.S. State Prescribing Rates, 2016, available at https://www.cdc.gov/drugoverdose/maps/rxstate2016.html (last visited Dec. 21, 2017).
[42] Centers for Disease Control and Prevention, U.S. State Prescribing Rates, 2014, 2015, 2016, available at https://www.cdc.gov/drugoverdose/maps/rxstate2014.html (last visited Dec. 21, 2017).
[43] Centers for Disease Control and Prevention, U.S. State Prescribing Rates, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, available at https://www.cdc.gov/drugoverdose/maps/rxstate2006.html (last visited Dec. 21, 2017).
[44] Louisiana Commission on Preventing Opioid Abuse, The Opioid Epidemic: Evidence Based Strategies Legislative Report, April 2017, at 20 (citations omitted), available at http://dhh.louisiana.gov/assets/docs/BehavioralHealth/Opioids/LCPOAFinalReportPkg20170331.pdf (last visited Dec. 21, 2017).

million for inpatient services.[45] These costs do not include potential costs related to long-term effects for healthcare and other services.[46] The number of newborns born with alcohol or drugs in their system rose from 569 in 2008 to 1,659 in 2016, according to the Department of Children and Family Services, with opioids being the most common drug found in these infants.[47]

**109.**

From 2013-2015 there were 6,252 opioid-related substance abuse treatment admissions in Louisiana.[48]

**110.**

Upon information and belief, Louisiana's spike in opioid overdoses, NAS, and other maladies were caused by the extremely high rates at which opioids have been prescribed in Louisiana over the past several years. As explained below, the high prescribing rates were caused by Defendants offensive conduct.

**111.**

State and local officials have been obligated to expend resources to combat the opioid epidemic. For example, the Louisiana Commission on Preventing Opioid Abuse has estimated that opioid abuse costs Louisiana $296 million a year in health care expenditures alone.[49]

### C. The Opioid Epidemic in Plaintiff's Community

**112.**

Ascension Parish suffered 73 opioid-related emergency department visits in 2015, nearly doubling the 37 opioid-related emergency department visits in 2014. *See* Table 1.

**Table 1: Opioid-Related Emergency Department Visits—Ascension Parish, 2013-2015**[50]

---

[45] Prevention, Screening & Treatment of Neonatal Abstinence Syndrome, (March 1, 2016) at 3, available at https://wwwcfprd.doa.louisiana.gov/boardsAndCommissions/RulesAndRegulations/223_Response%20to%20House %20Concurrent%20Resolution%20162-FINAL3-1-2016%20(3).pdf (last visited Dec. 21, 2017).
[46] *Id.*
[47] Julia O'Donoghue, "Louisiana infants born exposed to drugs, alcohol triples in 8 years," The Times-Picayune, (Sept. 18, 2017), available at http://www.nola.com/politics/index.ssf/2017/09/louisiana_newborns_drugs.html (last visited Dec. 21, 2017).
[48] Louisiana Department of Health, Opioid Abuse, Prevention, Treatment and Policy, Quick Facts (January 2017), available at http://ldh.la.gov/assets/opioid/OpioidAbsePrvntn_2017.pdf (last visited Dec. 21, 2017).
[49] Louisiana Commission on Preventing Opioid Abuse, *supra* note 41, at 17, citing Matrix Global Advisors, LLC (2014) Health Care Costs from Opioid Abuse: A State by State Analysis.
[50] *See* Louisiana Department of Health Louisiana Opioid Surveilliance Initiative, Bureau of Health Informatics ("Louisiana Opioid Surveilliance Initiative"), *Number of Opioid-Related Emergency Department Visits by Location* (March 18, 2019), available at https://lodss.ldh.la.gov/.

| Year | Opioid-Related Emergency Department Visits |
|------|------|
| **2013** | 30 |
| **2014** | 37 |
| **2015** | 73 |
| **AVG** | 46.67 |

**113.**

Ascension Parish suffered 31 opioid-related in-patient visits in 2017, more than doubling

the 14 opioid-related emergency department visits in 2012. *See* Table 2.

**Table 2:  Opioid-Related In-Patient Visits—Ascension Parish, 2012-2017**[51]

| Year | Opioid-Related In-Patient Visits |
|------|------|
| **2012** | 14 |
| **2013** | 21 |
| **2014** | 23 |
| **2015** | 30 |
| **2016** | 26 |
| **2017** | 31 |
| **AVG** | 24.17 |

**114.**

From 2006 to 2017, Ascension Parish averaged 1.144 opioid prescriptions per person, a

rate that is higher than 75% of Louisiana's 64 parishes and more than 150% that of the United

States. *See* Table 3.

**Table 3:  Opioid prescriptions dispensed per 100 persons**[52]

| Year | National | Louisiana | Ascension Parish |
|------|------|------|------|
| **2006** | 72.4 | 109.2 | 118.8 |
| **2007** | 75.9 | 110.1 | 116.5 |

---

[51] *See* Louisiana Opioid Surveillance Initiative, *Number of Opioid-Related In-Patient Visits by Location* (March 18, 2019), available at https://lodss.ldh.la.gov/.

[52] Centers for Disease Control and Prevention, U.S. County Prescribing Rates 2016. https://www.cdc.gov/drugoverdose/maps/rxcounty2016.html (last visited Dec. 11, 2017). The United States Center for Disease Control has calculated the geographic distribution at county levels of opioid prescriptions dispensed per 100 persons. U.S. Prescribing Rate Maps, CDC, available at, https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited March 24, 2018).

28

| | | | |
|---|---|---|---|
| **2008** | 78.2 | 113.7 | 134.5 |
| **2009** | 79.5 | 113 | 135.1 |
| **2010** | 81.2 | 112.6 | 124.9 |
| **2011** | 80.9 | 111.7 | 118.6 |
| **2012** | 81.3 | 113 | 117.1 |
| **2013** | 78.1 | 112.4 | 118.3 |
| **2014** | 75.6 | 108.9 | 110.1 |
| **2015** | 70.6 | 100.4 | 99.9 |
| **2016** | 66.5 | 98.1 | 93.5 |
| **2017** | 58.7 | 89.5 | 85.1 |
| **12 Year Average** | 74.9 | 107.7 | 114.4 |

### 115.

At all material times, opioids were prescribed to West Ascension residents and other members of Plaintiff's Community, causing Plaintiff to expend resources it would not otherwise expend but for the opioid epidemic.

## II. THE MANUFACTURER DEFENDANTS' FALSE, DECEPTIVE, AND UNFAIR MARKETING OF OPIOIDS.

### 116.

The opioid epidemic did not happen by accident.

### 117.

Before the 1990s, doctors generally did not prescribe opioids for chronic pain. Generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. The use of opioids for chronic pain was discouraged or prohibited, given the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects.

### 118.

Each Manufacturer Defendant has conducted, and has continued to conduct, a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, resulting in opioid treatment for a far broader group of patients who are much more likely to become addicted and suffer other adverse effects from the long-term use of opioids. In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars

29

on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.

### 119.

The Manufacturer Defendants have made false and misleading claims, contrary to the language on their drugs' labels, regarding the risks of using their drugs that: (1) downplayed the serious risk of addiction; (2) created and promoted the concept of "pseudoaddiction" when signs of actual addiction began appearing and advocated that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. The Manufacturer Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable evidence to support the Manufacturer Defendants' claims.

### 120.

The Manufacturer Defendants have disseminated these common messages to reverse the popular and medical understanding of opioids and risks of opioid use. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Manufacturer Defendants recruited for their support of their marketing messages, and through unbranded marketing and industry-funded front groups.

### 121.

The Manufacturer Defendants' efforts have been successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $11 billion in revenue for drug companies in 2010 alone.[53] Sales in the United States have exceeded $8 billion in revenue annually since 2009.[54] This urgent health crisis is connected to heavy marketing of opioids to doctors, many of whom were even taught— incorrectly—that opioids are not addictive when prescribed for legitimate pain. This epidemic has resulted in a flood of prescription opioids available for illicit use or sale (the supply), and a population of patients physically and psychologically dependent on

---

[53] *See* Katherine Eban, Oxycontin: Purdue Pharma's Painful Medicine, Fortune, Nov. 9, 2011, http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/; David Crow, Drugmakers Hooked on $10bn Opioid Habit, Fin. Times, Aug. 10, 2016, https://www. ft.com/content/f6e989a8-5dac-11e6-bb77-a121aa8abd95.
[54] *See* id.

them (the demand). And when those patients can no longer afford or obtain opioids from licensed dispensaries, they often turn to the street to buy prescription opioids or even non-prescription opioids, like heroin.

### 122.

The Manufacturer Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

**A.    Each Manufacturer Defendant Used Multiple Avenues to Disseminate Their False and Deceptive Statements about Opioids.**

### 123.

The Manufacturer Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in and around the State, including in West Ascension, the Parish and Plaintiff's Community. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout West Ascension, the Parish and Plaintiff's Community.

### 124.

The Manufacturer Defendants employed the same marketing plans and strategies and deployed the same messages in and around the State, including in West Ascension, the Parish and Plaintiff's Community, as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that the Manufacturer Defendants' messages are precisely delivered across marketing channels – including detailing visits, speaker events, and advertising – and in each sales territory. The Manufacturer Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

### 125.

The Manufacturer Defendants ensure marketing consistency through sales representative training; training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks and sales training materials; and nationally coordinated advertising. The Manufacturer Defendants' sales

representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

### 1. Direct Marketing

**126.**

The Manufacturer Defendants' direct marketing of opioids generally proceeded on two tracks. First, each Manufacturer Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of their branded drugs. For example, upon information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

**127.**

Many of the Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website, opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker, chef, and teacher, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. Upon information and belief, Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a 54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

**128.**

Second, each Manufacturer Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs. The Manufacturer Defendants have not corrected this misinformation. Instead, each Defendant devoted massive resources to direct sales contacts with doctors. Upon information and belief, in 2014 alone, the Manufacturer Defendants spent in excess of $168 million on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000.

**129.**

The Manufacturer Defendants' detailing to doctors is effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence.

Even without such studies, the Manufacturer Defendants purchase, manipulate and analyze some of the most sophisticated data available in any industry, data available from IMS Health Holdings, Inc., to track, precisely, the rates of initial prescribing and renewal by individual doctor, which in turn allows them to target, tailor, and monitor the impact of their core messages. The Manufacturer Defendants know their detailing to doctors is effective.

**130.**

The Manufacturer Defendants' detailers have been reprimanded for their deceptive promotions. Authorities have found that Actavis had been distributing promotional materials that minimize the risks associated with Kadian and misleadingly suggest that Kadian is safer than has been demonstrated. Those materials in particular fail to reveal warnings regarding potentially fatal abuse of opioids, use by individuals other than the patient for whom the drug was prescribed.

**2. Indirect Marketing**

**131.**

The Manufacturer Defendants indirectly marketed their opioids using unbranded advertising, paid speakers and "key opinion leaders" ("KOLs"), and industry-funded organizations posing as neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

**132.**

The Manufacturer Defendants deceptively marketed opioids in the State, Parish, West Ascension and Plaintiff's Community through unbranded advertising, including advertising that promotes opioid use generally but does not name a specific opioid. This advertising was ostensibly created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Manufacturer Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much as Defendants controlled the distribution of their "core messages" via their own detailers and speaker programs, the Manufacturer Defendants similarly controlled the distribution of these messages in scientific publications, treatment guidelines, Continuing Medical Education ("CME") programs, and medical conferences and seminars. To this end, the Manufacturer Defendants used third-party public relations firms to help control those messages when they originated from third-parties.

**133.**

The Manufacturer Defendants marketed through third-party, unbranded advertising to avoid regulatory scrutiny because that advertising is not typically reviewed by authorities. The Manufacturer Defendants also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source. Like the tobacco companies, the Manufacturer Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

**134.**

Defendants also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Defendants. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

**135.**

Borrowing a page from Big Tobacco's playbook, the Manufacturer Defendants worked through third parties they controlled by: (a) funding, assisting, encouraging, and directing doctors who served as KOLs, and (b) funding, assisting, directing, and encouraging seemingly neutral and credible Front Groups. The Manufacturer Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, CME programs, medical conferences and seminars, and scientific articles. Thus, working individually and collectively, and through these Front Groups and KOLs, the Manufacturer Defendants persuaded doctors and patients that what they have long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue, and that the compassionate treatment of pain required opioids.

**136.**

34

Purdue's indirect marketing strategies intentionally circumvented duties prohibiting Purdue from making misrepresentations in the promotion and marketing of OxyContin. Such actions include contributing to the creation of misleading publications and prescribing guidelines which lack reliable scientific basis and promoting prescribing practices which have worsened the opioid crisis. These were unfair and deceptive practices in its marketing, promotion, and sale of OxyContin.

**137.**

Doctors are one of the most important avenues that the Manufacturer Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. The Manufacturer Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the Purdue website "In the Face of Pain" failed to disclose that doctors who provided testimonials on the site were paid by Purdue. Purdue's failure to disclose these financial connections misled consumers regarding the objectivity of the testimonials.

**3. Key Opinion Leaders**

**138.**

Defendants utilized many KOLs, including many of the same ones.

**a. Russel Portenoy**

**139.**

Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL whom the Manufacturer Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue. Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1996 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by the Manufacturer Defendants.

**140.**

Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations, such as his claim that "the likelihood that the treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low." He appeared on Good Morning America in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely-watched program, broadcast across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[55]

### 141.

Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." These lectures falsely claimed that less than 1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[56] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[57]

#### b.  Lynn Webster

### 142.

Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President of the AAPM in 2013. He is a Senior Editor of Pain Medicine, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from the Manufacturer Defendants (including nearly $2 million from Cephalon).

### 143.

---

[55] Good Morning America (ABC Aug. 30, 2010).
[56] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, WALL ST. J. (Dec. 17, 2012), https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.
[57] *Id.*

During a portion of his time as a KOL, Dr. Webster and his clinic were investigated for overprescribing More than 20 of Dr. Webster's former patients at the Lifetree Clinic have died of opioid overdoses.

### 144.

Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue. Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own guidelines, indicating, also, their reliance on the Manufacturer Defendants and those under their influence and control.

### 145.

In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue entitled "Managing Patient's Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach doctors in the State and doctors treating members of Plaintiff's Community, including in West Ascension and the Parish.[58]

### 146.

Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to increase a patient's dose of opioids. As he and co-author Beth Dove wrote in their 2007 book Avoiding Opioid Abuse While Managing Pain—a book that is still available online—when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."[59] Upon information and belief, Endo distributed this book to doctors. Years later, Dr. Webster reversed himself,

---

[58] *See* Emerging Solutions in Pain, Managing Patient's Opioid Use: Balancing the Need and the Risk, http://www.emergingsolutionsinpain.com/ce-education/opioid-management?option=com_continued&view=frontmatter&Itemid=303&course=209 (last visited Aug. 22, 2017).
[59] Lynn Webster & Beth Dove, Avoiding Opioid Abuse While Managing Pain (2007).

acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[60]

#### 4. Front Groups

**147.**

The Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of the Manufacturer Defendants, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also assisted the Manufacturer Defendants by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by the Manufacturer Defendants.

**148.**

These Front Groups depended on the Manufacturer Defendants for funding and, in some cases, for survival. The Manufacturer Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, the Manufacturer Defendants made sure that the Front Groups would generate only the messages that the Manufacturer Defendants wanted to distribute. Despite this, the Front Groups held themselves out as independent and serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

**149.**

Defendants Cephalon, Endo, Janssen, and Purdue, in particular, utilized many Front Groups, including many of the same ones. Several of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), the Center for Practical Bioethics ("CPB"), the U.S. Pain Foundation ("USPF") and Pain & Policy Studies Group ("PPSG").

##### a. American Pain Foundation

**150.**

---

[60] John Fauber, Painkiller Boom Fueled by Networking, Milwaukee Wisc. J. Sentinel, Feb. 18, 2012, http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html.

The most prominent of the Manufacturer Defendants' Front Groups was the American Pain Foundation ("APF"), which, upon information and belief, received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012, primarily from Endo and Purdue. APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach citizens of the State, West Ascension, the Parish and Plaintiff's Community.

**151.**

In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, upon information and belief, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.

**152.**

APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. Upon information and belief, it was often called upon to provide "patient representatives" for the Manufacturer Defendants' promotional activities, including for Purdue's Partners Against Pain and Janssen's Let's Talk Pain. APF functioned largely as an advocate for the interests of the Defendants, not patients. Indeed, upon information and belief, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

**153.**

Upon information and belief, on several occasions, representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and

publications, knowing that drug companies would support projects conceived as a result of these communications.

**154.**

The U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and the Manufacturer Defendants stopped funding it. Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[61]

**b. American Association of Pain Management**

**155.**

Another front group for the Manufacturer Defendants was the American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement, and funding of the Manufacturer Defendants, the AAPM issued purported treatment guidelines and sponsored and hosted medical education programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

**156.**

AAPM received substantial funding from opioid manufacturers. For example, AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

**157.**

---

[61] Charles Ornstein & Tracy Weber, Senate Panel Investigates Drug Companies' Ties to Pain Groups, Wash. Post, May 8, 2012, https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html.

Upon information and belief, AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry Fine and Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation.

### 158.

The Manufacturer Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

### 159.

In 1996, AAPM and APS jointly issued a consensus statement, "The Use of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain and claimed that the risk of a patients' addiction to opioids was low. Dr. Haddox, who co-authored the AAPM/APS statement, was a paid speaker for Purdue at the time. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011, and, upon information and belief, was taken down from AAPM's website only after a doctor complained.[62]

### 160.

AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain.[63] Treatment guidelines have been relied upon by doctors, especially the general practitioners and family doctors targeted by the Manufacturer Defendants. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

### 161.

At least fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue. The 2009 Guidelines promote opioids as "safe and

---

[62] The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society, 13 Clinical J. Pain 6 (1997).
[63] Roger Chou *et al.*, Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain, 10 J. Pain 113 (2009).

effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.[64] One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Manufacturer Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited hundreds of times in academic literature, were disseminated in the State and/or West Ascension, the Parish and Plaintiff's Community during the relevant time period, are still available online, and were reprinted in the Journal of Pain. The Manufacturer Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Manufacturer Defendants' financial support to members of the panel.

**162.**

The Manufacturer Defendants worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Cephalon, Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from the Manufacturer Defendants. Among other projects, PCF worked to ensure that an imposed education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Manufacturer Defendants determined would reduce prescribing.

### B. The Manufacturer Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids.

**1. The Manufacturer Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs.**

**163.**

---

[64] *Id.*

To falsely assure physicians and patients that opioids are safe, the Manufacturer Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked. These misrepresentations reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low risk because most patients would not become addicted, and because those at greatest risk for addiction could be identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. The Manufacturer Defendants have not only failed to correct these misrepresentations, they continue to make them today.

**164.**

Opioid manufacturers, including Manufacturer Defendants Endo Pharmaceuticals, Inc. and Purdue Pharma L.P., are prohibited from making many of the misrepresentations identified in this Petition. Yet each Manufacturer Defendant continues to misrepresent the risks and benefits of long-term opioid use in the State, Parish, and Plaintiff's Community and each continues to fail to correct its past misrepresentations.

**165.**

Some illustrative examples of the Manufacturer Defendants' false, deceptive, and unfair claims about the purportedly low risk of addiction include:

a. Actavis's predecessor caused a patient education brochure, Managing Chronic Back Pain, to be distributed beginning in 2003 that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Actavis continued to use this brochure in 2009 and beyond.

b. Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which suggested that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication was recently still available online.[65]

c. Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted."

---

[65] Am. Pain Found., Treatment Options: A Guide for People Living in Pain (2007) [hereinafter APF, Treatment Options], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

Upon information and belief, another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

d. Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled Living with Someone with Chronic Pain, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

e. Janssen reviewed, edited, approved, and distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

f. Janssen has run a website, Prescriberesponsibly.com (last updated July 2, 2015), which has claimed that concerns about opioid addiction are "overestimated."

g. Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "[m]isconceptions about opioid addiction."[66]

h. Consistent with the Manufacturer Defendants' published marketing materials, upon information and belief, detailers for Purdue, Endo, Janssen, and Cephalon in the State, Parish, West Ascensino and Plaintiff's Community minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

i. Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF and NFP argued i that patients rarely become addicted to prescribed opioids, citing research by their KOL, Dr. Portenoy.

166.

These claims are contrary to longstanding scientific evidence. A 2016 opioid-prescription guideline issued by the CDC (the "2016 CDC Guideline") explains that there is "[e]xtensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction], [and] overdose . . .)."[67] The 2016 CDC Guideline further explains that "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[68]

167.

Authorities have found that most opioid drugs have 'high potential for abuse and that opioids are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death. Because of the known serious risks associated with

---

[66] Am. Pain Found., A Policymaker's Guide to Understanding Pain and Its Management 6 (2011) [hereinafter APF, Policymaker's Guide], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.
[67] Deborah Dowell et al., CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016, Morbidity & Mortality Wkly. Rep., Mar. 18, 2016, at 15 [hereinafter 2016 CDC Guideline], https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.
[68] Id. at 2, 25.

long-term opioid use, including risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death, opioids should be used only in patients for whom alternative treatment options like non-opioid drugs have failed.

### 168.

Opioid use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder. Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but, upon information and belief, Endo had no evidence for that statement. Endo has recently agreed not to make statements that opioids generally are non-addictive or that most patients who take opioids do not become addicted, at lease in some jurisdictions.

### 169.

In addition to mischaracterizing the highly addictive nature of the drugs they were pushing, the Manufacturer Defendants also fostered a fundamental misunderstanding of the signs of addiction. Specifically, the Manufacturer Defendants misrepresented, to doctors and patients, that warning signs and/or symptoms of addiction were, instead, signs of undertreated pain (*i.e.* pseudoaddiction) – and instructed doctors to increase the opioid prescription dose for patients who were already in danger.

### 170.

To this end, one of Purdue's employees, Dr. David Haddox, invented a phenomenon called "pseudoaddiction." KOL Dr. Portenoy popularized the term. Examples of the false, misleading, deceptive, and unfair statements regarding pseudoaddiction include:

   a. Cephalon and Purdue sponsored Responsible Opioid Prescribing (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction.[69] The 2012 edition, which remains available for sale online, continues to teach that pseudoaddiction is real.[70]

   b. Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated

---

[69] Scott M. Fishman, M.D., Responsible Opioid Prescribing: A Physician's Guide (2007) at 62.
[70] *See* Scott M. Fishman, M.D., Responsible Opioid Prescribing: A Physician's Guide (2d ed. 2012).

. . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

c. Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

d. Purdue published a pamphlet in 2011 entitled Providing Relief, Preventing Abuse, which, upon information and belief, described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."

e. Upon information and belief, Purdue sponsored a CME program titled "Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse". In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

**171.**

The CDC rejects the validity of the pseudoaddiction fallacy invented by a Purdue employee as a reason to push more opioid drugs onto already addicted patients.

**172.**

In addition to misstating the addiction risk and inventing the pseudoaddiction falsehood, a third category of false, deceptive, and unfair practice is the Manufacturer Defendants' false instructions that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because the Manufacturer Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Manufacturer Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain. Illustrative examples include:

a. Endo paid for a 2007 supplement in the Journal of Family Practice written by a doctor who became a member of Endo's speakers' bureau in 2010. The supplement, entitled Pain Management Dilemmas in Primary Care: Use of Opioids, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

b. Purdue, upon information and belief, sponsored a 2011 webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

c. As recently as 2015, upon information and belief, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

**173.**

To the contrary, upon information and believe, there are no studies assessing the effectiveness of risk mitigation strategies for improving outcomes related to overdose, addiction, abuse or misuse.

**174.**

A fourth category of deceptive messaging regarding dangerous opioids is the Manufacturer Defendants' false assurances regarding the alleged ease of eliminating opioid dependence. The Manufacturer Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, but they failed to disclose the increased difficulty of stopping opioids after long-term use. In fact, the symptoms of opioid withdrawal include abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia, drug cravings, anxiety, insomnia, spontaneous abortion and premature labor in pregnant women.

**175.**

The Manufacturer Defendants nonetheless downplayed the severity of opioid detoxification. For example, upon information and belief, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days. And Purdue sponsored APF's A *Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.[71]

**176.**

A fifth category of false, deceptive, and unfair statements the Manufacturer Defendants made to sell more drugs is that opioid dosages could be increased indefinitely without added risk. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. The Manufacturer Defendants' deceptive claims include:

---

[71] Am. Pain Found., A Policymaker's Guide to Understanding Pain and Its Management 6 (2011) [hereinafter APF, Policymaker's Guide], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf., at 32.

a.  Upon information and belief, Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis appears to have continued to use these materials in 2009 and beyond.

b.  Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and insinuated that they are therefore the most appropriate treatment for severe pain.[72] This publication is still available online.

c.  Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

d.  Endo distributed a pamphlet edited by a KOL entitled Understanding Your Pain: Taking Oral Opioid Analgesics (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . . You won't 'run out' of pain relief."[73]

e.  Janssen sponsored a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f.  Upon information and belief, Purdue's In the Face of Pain website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g.  Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which taught that dosage escalations are "sometimes necessary," and that "the need for higher doses of medication is not necessarily indicative of addiction," but inaccurately downplayed the risks from high opioid dosages.[74]

h.  In 2007, Purdue sponsored a CME entitled "Overview of Management Options" that was available for CME credit and available until at least 2012. The CME was edited by a KOL and taught that Non-steroidal Anti-inflammatory Drugs ("NSAIDs") and other drugs, but not opioids, are unsafe at high dosages.

i.  Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders," challenging the correlation between opioid dosage and overdose.[75]

j.  Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer Defendants' Front Groups APF and NFP argued in an amicus brief to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.[76]

**177.**

---

[72] Am. Pain Found., Treatment Options: A Guide for People Living in Pain (2007) [hereinafter APF, Treatment Options], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf., at 12.
[73] Margo McCaffery & Chris Pasero, Endo Pharm., Understanding Your Pain: Taking Oral Opioid Analgesics (Russell K Portenoy, M.D., ed., 2004).
[74] Am. Pain Found., A Policymaker's Guide to Understanding Pain and Its Management 6 (2011) [hereinafter APF, Policymaker's Guide], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf., at 32.
[75] The College on Problems of Drug Dependence, About the College, http://cpdd.org (last visited Aug. 21, 2017).
[76] Brief of APF, at 9.

Once again, the Manufacturer Defendants' representations regarding opioids were lacking in scientific evidence. Upon information and believe, the benefits of high-dose opioids for chronic pain are not established while the risks for serious harms related to opioid therapy increase at higher opioid dosage. More specifically, there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages. There is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages. Authorities advise doctors to avoid increasing dosage to above 90 morphine milligram equivalents per day.

178.

Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can cure addiction and abuse.

179.

The Manufacturer Defendants made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. This claim was false. Opana ER Extended-Release Tablets' extended-release features can be compromised, causing the medication to "dose dump," when subject to forms of manipulation such as cutting, grinding, or chewing, followed by swallowing. Opana ER can be prepared for snorting using commonly available methods and readily prepared for injection. There has existed the troubling possibility that a higher and rising percentage of Opana ER Extended-Release Tablet abuse has occurred via injection. Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed. Authorities have requested that Opana ER be removed from the market.

**2. The Manufacturer Defendants embarked upon a campaign of false, deceptive, and unfair assurances grossly overstating the benefits of the opioid drugs.**

180.

To convince doctors and patients that opioids should be used to treat chronic pain, the Manufacturer Defendants also had to persuade them that there was a significant upside to long-term opioid use. But authorities make clear that no evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤6 weeks in duration) and that other treatments were more or equally beneficial and less harmful than long-term opioid use. There is a

49

lack of evidence to support long-term opioid use. Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence.

**181.**

Some illustrative examples of the Manufacturer Defendants' false claims are:

a. Upon information and belief, Actavis distributed an advertisement claiming that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

b. Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

c. Janssen sponsored and edited a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009) – which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

d. Janssen promoted Ultracet for everyday chronic pain and distributed posters, for display in doctors' offices, of presumed patients in active professions; the caption read, "Pain doesn't fit into their schedules."

e. Upon information and belief, Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves patients' function.

f. Responsible Opioid Prescribing (2007), sponsored and distributed by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function.

g. Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve."[77] This publication is still available online.

h. Endo's NIPC website "PainKnowledge" claimed in 2009, upon information and belief, that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

i. Endo was the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient."[78] Upon information and belief, a CME disseminated via webcast claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

j. Janssen sponsored and funded a multimedia patient education campaign called "Let's Talk Pain." One feature of the campaign was to complain that patients were under-treated. In 2009, upon information and belief, a Janssen-sponsored website, part of the "Let's Talk

---

[77] Am. Pain Found., Treatment Options: A Guide for People Living in Pain (2007) [hereinafter APF, Treatment Options], https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

[78] *E.g.*, NIPC, Persistent Pain and the Older Patient (2007), https://www.painedu.org/Downloads/NIPC/Activities/B173_Providence_RI_%20Invite.pdf.

Pain" campaign, featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function."

k. Purdue sponsored the development and distribution of APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "[m]ultiple clinical studies" have shown that opioids are effective in improving "[d]aily function," "[p]sychological health," and "[o]verall health-related quality of life for chronic pain."[79] The Policymaker's Guide was originally published in 2011.

l. Purdue's, Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

**182.**

These claims have no support in the scientific literature.

**183.**

Upon information and belief, as of 2010, there was no substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug Kadian had in alleviating pain, taken together with any drug-related side effects patients may experience results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life.

**184.**

Upon information and belief, as of 2008, the claim that patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities had not been demonstrated by substantial evidence or clinical experience.

**185.**

The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by the Manufacturer Defendants contravened scientific evidence. Indeed, the labels for extended-release and long-acting ("ER/LA") opioids in  and immediate-release ("IR") opioids were changed in 2013 and 2016, respectively, to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." Indeed, authorities advise that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain. Purdue misleadingly promoted OxyContin as being unique among opioids in

---

[79] Am. Pain Found., A Policymaker's Guide to Understanding Pain and Its Management 6 (2011) [hereinafter APF, Policymaker's Guide], http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf., at 29.

providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action. Upon information and belief, Purdue's own research shows that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure. In 2008 a substantial proportion of chronic pain patients taking OxyContin experienced it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

**186.**

Purdue's competitors were aware of this problem. For example, upon information and belief, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours. Upon information and belief, Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours.

**187.**

Front Groups supported by Purdue likewise echoed these representations. For example, the National Foundation for the Treatment of Pain and the Ohio Pain Initiative has represented that OxyContin has been a miracle medication, particularly useful for sustained long-term pain because it comes in higher, compact pills with a slow release coating. They represented, moreover, that OxyContin pills can work for 12 hours, which makes it easier for patients to comply with dosing requirements without experiencing a roller-coaster of pain relief followed quickly by pain renewal that can occur with shorter acting medications, and helps the patient sleep through the night, which is often impossible with short-acting medications. OxyContin has been a miracle medication.[80]

**188.**

---

[80] Reply Brief of Amicus Curiae of the American Pain Foundation, The National Foundation for the Treatment of Pain and the Ohio Pain Initiative Supporting Appellants, Howland v. Purdue Pharma L.P., No. 2003-1538 (Ohio Apr. 13, 2004), 2004 WL 1637768, at *4 (footnote omitted).

Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though authorities have limited their use to the treatment of cancer pain in opioid tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, Cephalon has been prohibited from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients. Indeed, Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury. Fentora is only approved for breakthrough cancer pain in patients who are opioid-tolerant, meaning those patients who take a regular, daily, around-the-clock narcotic pain medication.

**189.**

Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, and for which it is not safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example:

a. Cephalon paid to have a CME it sponsored, Opioid-Based Management of Persistent and Breakthrough Pain, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

b. Upon information and belief, Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

c. In December 2011, Cephalon widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

**190.**

Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the regulators for such uses.

**191.**

192.

Like Purdue,[81] Endo has been cited for its failure to set up an effective system for identifying and reporting excessive or unusual prescribing. Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose excessive or unusual conduct had caused them to be placed on a no-call list.

### C.  The Manufacturer Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations.

193.

As a part of their deceptive marketing scheme, the Manufacturer Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the U.S., including this State, Parish, and Plaintiff's Community. For example, the Manufacturer Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept the Manufacturer Defendants' misrepresentations.

194.

The Manufacturer Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. The Manufacturer Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, existing evidence confirms that elderly patients taking opioids suffer from elevated fall and fracture risks, reduced renal function and medication clearance, and a smaller window between safe and unsafe dosages. There must be additional caution and increased monitoring to minimize the risks of opioid use in elderly patients. The same is true for veterans,

---

[81] Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Purdue's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than perform their duty under Louisiana law to report these doctors to state medical boards or law enforcement authorities as Purdue is legally obligated to do or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade regulators to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. Purdue's senior compliance officer has acknowledged that in five years of investigating  pharmacies who fill excessive or unusual orders, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs. For example, Purdue did not report that a Los Angeles clinic prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described it internally as "an organized drug ring" until years after law enforcement shut it down. In doing so, Purdue protected its own profits at the expense of public health and safety.

who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

**D. The Manufacturer Defendants made Materially Deceptive Statements and Concealed Material Facts.**

**195.**

As alleged herein, the Manufacturer Defendants made and/or disseminated deceptive statements regarding material facts and further concealed material facts, in the course of manufacturing, marketing, and selling prescription opioids. The Manufacturer Defendants' actions were intentional, negligent, and/or unlawful. Such statements include, but are not limited to, those set out below and alleged throughout this Petition.[82]

**196.**

Defendant Endo made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

---

[82] Purdue made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a.  Creating, sponsoring, and assisting in the distribution of patient education materials distributed to consumers that contained deceptive statements;

b.  Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c.  Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through Purdue's own unbranded publications and on internet sites Purdue operated that were marketed to and accessible by consumers;

d.  Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

e.  Sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

f.  Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g.  Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h.  Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i.  Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

j.  Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k.  Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l.  Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain;

m.  Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

n.  Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

o.  Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

p.  Exclusively disseminating misleading statements in education materials to hospital doctors and staff while purportedly educating them on new pain standards;

q.  Making deceptive statements concerning the use of opioids to treat chronic noncancer pain to prescribers through in-person detailing; and

r.  Withholding from law enforcement the names of prescribers Purdue believed to be facilitating the diversion of its opioid, while simultaneously marketing opioids to these doctors by disseminating patient and prescriber education materials and advertisements and CMEs they knew would reach these same prescribers.

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b. Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

c. Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high risk patients;

d. Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e. Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f. Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

g. Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

h. Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

i. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

j. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

l. Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

m. Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

**197.**

Defendant Janssen made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

56

b. Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

c. Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Janssen exercised final editorial control and approval;

d. Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

e. Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose dependent risks of opioids versus NSAIDs;

f. Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g. Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

h. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

i. Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and made false statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

j. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

k. Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

l. Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

m. Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

n. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

**198.**

Defendant Cephalon made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b. Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

c. Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

d. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

e. Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

f. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

g. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

h. Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

i. Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

j. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events.

**199.**

Defendant Actavis made and/or disseminated deceptive statements, and concealed material facts in such a way to make their statements deceptive, including, but not limited to, the following:

a. Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

b. Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

c. Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

d. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

**E.  The Manufacturer Defendants Fraudulently Concealed Their Misconduct.**

58

**200.**

The Manufacturer Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience establish that opioids are highly addictive and are responsible for a long list of very serious adverse outcomes. Regulators warned Defendants of this, and Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and death – all of which clearly described the harm from long-term opioid use and that patients were suffering from addiction, overdose, and death in alarming numbers. More recently, authorities have issued pronouncements, based on medical evidence, that conclusively expose the falsity of Defendants' misrepresentations, and Endo and Purdue have recently entered into agreements prohibiting them from making some of the same misrepresentations described in this Petition.

**201.**

At all times relevant to this Petition, the Manufacturer Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, Defendants disguised their role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. The Manufacturer Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Manufacturer Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain. Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. The Manufacturer Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, PainKnowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Manufacturer Defendants, such as Purdue and Janssen, ran similar websites that masked their own role.

**202.**

Finally, the Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that these documents were accurate, truthful, and supported by objective evidence when they were not. The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Manufacturer Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community. The Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. The Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. The Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The lack of support for the Manufacturer Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by Plaintiff or Plaintiff's Community. Thus, the Manufacturer Defendants successfully concealed from the medical community, patients, and health care payors facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. Plaintiff did not know of the existence or scope of the Manufacturer Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

### III. DISTRIBUTOR DEFENDANTS' UNLAWFUL DISTRIBUTION OF OPIOIDS

#### 203.

The Distributor Defendants owe a duty under Louisiana law[83] to monitor, detect, investigate, refuse to fill, and report excessive or unusual orders of prescription opioids originating from the Parish, the City and Plaintiff's Community as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted into West Ascension, the Parish and/or Plaintiff's Community.

#### 204.

The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

#### 205.

Each Distributor Defendant repeatedly and purposefully breached its legal duties. Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into West Ascension, the Parish and Plaintiff's Community.

#### 206.

The unlawful diversion of prescription opioids is a direct and proximate cause and/or substantial contributing factor to the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the State and in West Ascension, the Parish and Plaintiff's Community. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover here.

#### 207.

The opioid epidemic in the State, including *inter alia* in West Ascension, the Parish and Plaintiff's Community, remains an immediate hazard to public health and safety.

#### 208.

The opioid epidemic in West Ascension, the Parish and Plaintiff's Community is a temporary and continuous public nuisance and remains unabated.

#### 209.

Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

---

[83] *See, e.g.,* 46 La. Admin. Code Pt XCI, § 313.

61

**A. Drug Distributors Have Duties to Guard Against and Report Unlawful Diversion and to Report and Prevent Excessive or Unusual Orders under Louisiana Law.**

**210.**

Opioids are a schedule II controlled substances under Louisiana law. *See* La. Rev. Stat. § 40:964. Opioids are categorized as "Schedule II" drugs because they have a "high potential for abuse" and the potential to cause "severe psychic or physical dependence." La. Rev. Stat. § 40:963.B. "Physical dependence is an expected result of opioid use." La. Rev. Stat. § 40:961.

**211.**

As drug distributors, each Defendant was required under Louisiana law to first be licensed by the Louisiana Board of Pharmacy. La. Rev. Stat. § 40:973(A). To receive and maintain this license, each of the Defendant Distributors assumed a duty to comply with "applicable state and local laws and regulations." La. Rev. Stat. § 40:974(A)(2). To receive a license under the Louisiana Drug and Device Distributors Act, Defendant Distributors were required to meet legal requirements and comply with regulations and other laws. *E.g.,* La. Rev. Stat. §§ 37:3469; 37:3467, 37:3472; La. Admin. Code Pt. XCI, § 711.

**212.**

The Louisiana State Board of Pharmacy has the authority to suspend or revoke a license issued to Distributors who violate the Louisiana Controlled Dangerous Substance Law or any laws "pertaining to the manufacture, distribution or dispensing of controlled dangerous substances." La. Rev. Stat. § 40:975. Except as authorized, it is unlawful to knowingly or intentionally "manufacture, distribute, or dispense" Schedule II drugs. La. Rev. Stat. § 40:967(A).

**213.**

The Louisiana Board of Drug and Device Distributors also can deny, revoke or suspend a license for violation of any law or regulation relating to drugs. 46 La. Admin. Code Pt. XCI, § 711.

**214.**

Each Distributor Defendant has an affirmative duty to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. Distributors of opioids must maintain effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels. Louisiana law requires that drug distributors shall "adhere to written policies and procedures, which shall be followed for the receipt, security, storage, inventory, and distribution of drugs or devices, including policies and procedures for

identifying, recording, and reporting losses or thefts," including, procedures to review "excessive or suspicious" purchases and to notify the board in writing after discovering any theft or diversion of a drug. 46 La. Admin. Code Pt. XCI, § 313; *see also* La. Rev. Stat. § 40:974(A)(1) & (A)(4).

### 215.

State regulations require that wholesale distributors maintain procedures to review excessive or unusual purchases. La. Admin. Code Pt. XCI, § 313. Drug distributors have a non-delegable duty to design and operate a system to disclose to the registrant excessive or unusual orders of controlled substances and inform the authorities of such orders when discovered.

### 216.

Excessive or unusual orders include, for example, orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported. Likewise, a distributor need not wait for a normal pattern to develop over time before determining whether an order must be reported. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report. The determination of whether the order must be so reported depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the distributor's customer base and the patterns throughout the relevant segment of the distributor industry.

### 217.

In addition to reporting such orders, distributors must also stop shipment on any order which is flagged as excessive or unusual and only ship orders which were flagged as potentially excessive or unusual if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels. Regardless, all flagged orders must be reported.

### 218.

These prescription drugs are regulated for the purpose of providing a closed system intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

### 219.

Distributors are one of the key components of the distribution chain. If the closed system is to function properly distributors must be vigilant in deciding whether a prospective customer

63

can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.

**220.**

The Distributor Defendants have admitted that they are responsible for reporting excessive or unusual orders.[84]

**221.**

A distributor, in addition to reporting excessive or unusual orders, has a legal responsibility to exercise due diligence to avoid filling excessive or unusual orders that might be diverted into other than legitimate medical, scientific, and industrial channels. Distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. Even just one distributor that facilitates diversion can cause enormous harm.

**222.**

Filing a monthly report of completed transactions does not meet the duty under Louisiana law to report excessive or unusual orders. They must conduct an independent analysis of excessive or unusual orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as excessive or unusual will not absolve the distributer of responsibility if it knew, or should have known, that the controlled substances were being diverted.

**223.**

A distributor's investigation must dispel all the red flags giving rise to excessive or unusual circumstances prior to shipping an excessive or unusual order.

**224.**

The Distributor Defendants admit that they have not only legal responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society.

**225.**

The Distributor Defendants knew they were required to monitor, detect, and stop excessive or unusual orders. Distributors are at the center of a sophisticated supply chain and therefore are

---

[84] *E.g.*, Testimony of Plaintiff's Witness, Paul Meade Dickson, President of Morris & Dickson Company, LLC, Transcript of Hearing on Motion for Temporary Restraining Order, Case No. 5:18-cv-00605 (W.D. La. May 8, 2018) (Doc. No. 23).

uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers. If an order is excessive of unusual, the distributor should limit the shipment to the customer.

### 226.

Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers in West Ascension, the Parish and Plaintiff's Community and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to West Ascension, the Parish and Plaintiff's Community.

### 227.

Each Distributor Defendant owes and has owed duties to monitor and detect excessive or unusual orders of prescription opioids; investigate and refuse excessive or unusual orders of prescription opioids; report excessive or unusual orders of prescription opioids; and prevent the diversion of prescription opioids into illicit markets in the State, the Parish, and Plaintiff's Community.

### 228.

The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

### 229.

The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality in West Ascension, the Parish and Plaintiff's Community and the damages caused thereby.

**B.  The Distributor Defendants Breached Their Duties.**

### 230.

Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances.

### 231.

The sheer volume of prescription opioids distributed to pharmacies in West Ascension, the Parish and Plaintiff's Community, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into West Ascension, the Parish and Plaintiff's

Community, is excessive or unusual for the medical need of the community and facially excessive or unusual. Some are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.

**232.**

The Distributor Defendants failed to report excessive or unusual orders originating from West Ascension, the Parish and/or Plaintiff's Community, or which the Distributor Defendants knew were likely to be diverted to West Ascension, the Parish and Plaintiff's Community, and to the authorities, including the Louisiana Board of Pharmacy.

**233.**

The Distributor Defendants unlawfully filled excessive or unusual orders in West Ascension, the Parish and Plaintiff's Community, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted in West Ascension, the Parish and Plaintiff's Community.

**234.**

The Distributor Defendants breached their duty under Louisiana law to monitor, detect, investigate, refuse and report excessive or unusual orders of prescription opiates originating from West Ascension, the Parish and Plaintiff's Community, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to West Ascension, the Parish and Plaintiff's Community.

**235.**

The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

**236.**

The Distributor Defendants breached their duty to create and operate a system to disclose excessive or unusual orders of controlled substances and failed to inform the state and local authorities of excessive or unusual orders, in violation of their duties under Louisiana law.

**237.**

The Distributor Defendants breached their duties under Louisiana law to exercise due diligence to avoid filling orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.

**238.**

Public safety laws are at issue.

**239.**

The Distributor Defendants' violations of public safety statutes constitute prima facie evidence of negligence under Louisiana law.

**240.**

The Distributor Defendants supplied prescription opioids to suspect physicians and pharmacies, and enabled the illegal diversion of opioids, aided criminal activity, and disseminated massive quantities of prescription opioids into the black market.

**241.**

The unlawful conduct by the Distributor Defendants is purposeful and intentional. The Distributor Defendants refuse to abide by the duties imposed by Louisiana law.

**242.**

The Distributor Defendants acted with actual malice in breaching their duties, *i.e.*, they have acted with a conscious disregard for the rights and safety of citizens of Ascension Parish, Louisiana, and other persons, and said actions have a great probability of causing substantial harm.

**243.**

The Distributor Defendants' repeated shipments of excessive or unusual orders, over an extended period of time, in violation of public safety statutes, and without reporting the excessive or unusual orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others under Louisiana law.

**244.**

The Distributor Defendants have repeatedly misrepresented their compliance with their legal duties and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

**245.**

Plaintiff recently discovered that at various times during the period from January 1, 2009 through January 17, 2017, McKesson did not identify or report certain orders placed by certain pharmacies which should have been detected; McKesson distributed controlled substances to

pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice; and McKesson failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers.

**246.**

Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, exerted pressure to halt prosecutions and lobbied to strip law enforcement of its ability to immediately suspend distributor registrations.

**247.**

In addition to taking actions to limit prosecutions and suspensions, the Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations that arise under Louisiana law. Through such statements, the Distributor Defendants attempted to assure the public, including in the Parish, they were working to curb the opioid epidemic.

**248.**

For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[85] Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results.

**249.**

Similarly, Defendant McKesson publicly stated that it has a best-in-class controlled substance monitoring program to help identify excessive or unusual orders, and claimed it is deeply passionate about curbing the opioid epidemic in our country. Again, given McKesson's historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

---

[85] Lenny Bernstein *et al.*, *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job*, WASH. POST (Oct. 22, 2016), https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

**250.**

By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. Plaintiff did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

**251.**

Meanwhile, the opioid epidemic rages unabated in the Nation, the State, and in West Ascension, the Parish and Plaintiff's Community.

**252.**

The wrongful actions and omissions of the Distributor Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's racketeering allegations below.

**253.**

The Distributor Defendants have abandoned their legal duties and abused the privilege of distributing controlled substances in the State, Parish, and Plaintiff's Community.

### IV. THE MANUFACTURER DEFENDANTS' UNLAWFUL FAILURE TO PREVENT DIVERSION AND MONITOR, REPORT, AND PREVENT EXCESSIVE AND UNUSUAL ORDERS.

**254.**

The same legal duties to prevent diversion, and to monitor, report, and prevent excessive or unusual orders of prescription opioids that were incumbent upon the Distributor Defendants were also imposed on Manufacturer Defendants pursuant to duties under Louisiana law.

**255.**

The Manufacturing Defendants were required to comply with the same licensing requirements as the Distributor Defendants and the same rules regarding prevention of diversion and reporting excessive or unusual orders, as set out above. *See* La. Rev. Stat. §§ 40:973(A); 40:974(A)(1) & (A)(4); 40:975; 40:967(A).

**256.**

Like the Distributor Defendants, the Manufacturer Defendants were required to register to manufacture schedule II controlled substances, like prescription opioids; to maintain effective controls against diversion of opioids into other than legitimate medical, scientific, research, or

69

industrial channels, by limiting the importation and bulk manufacture of such controlled substances to a number of establishments which can produce an adequate and uninterrupted supply of these substances under adequately competitive conditions for legitimate medical, scientific, research, and industrial purposes; to monitor, report, and prevent excessive or unusual orders of controlled substances, to design and operate a system to disclose to the registrant excessive or unusual orders of controlled substances, and to report excessive or unusual orders upon discovery.

**257.**

Like the Distributor Defendants, the Manufacture Defendants breached these duties.

**258.**

For example, Plaintiff recently learned that Defendant Mallinckrodt was fined $35 million for failure to report excessive or unusual orders of controlled substances, including opioids, and for violating recordkeeping requirements.

**259.**

The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent excessive or unusual orders and to prevent diversion. The Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, the Manufacturer Defendants knew – just as the Distributor Defendants knew – the volume, frequency, and pattern of opioid orders being placed and filled. The Manufacturer Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

**260.**

Through, *inter alia*, the charge back data, the Manufacturer Defendants could monitor excessive or unusual orders of opioids.

**261.**

The Manufacturer Defendants failed to monitor, report, and stop excessive or unusual orders of opioids as required by duties under Louisiana law.

262.

The Manufacturer Defendants' failures to monitor, report, and prevent or stop excessive or unusual orders of opioids were intentional, negligent and unlawful.

263.

The Manufacturer Defendants have misrepresented their compliance with legal duties.

264.

The Manufacturer Defendants enabled the supply of prescription opioids to suspect physicians and pharmacies, enabled the illegal diversion of opioids, aided criminal activity, and disseminated massive quantities of prescription opioids into the black market.

265.

The wrongful actions and omissions of the Manufacturer Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's racketeering allegations below.

266.

The Manufacturer Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent excessive or unusual orders have enabled the unlawful diversion of opioids into the Parish, State and Plaintiff's Community.

## V. DEFENDANTS' UNLAWFUL CONDUCT AND BREACHES OF DUTIES UNDER LOUISIANA LAW CAUSED THE HARM ALLEGED HEREIN AND SUBSTANTIAL DAMAGES.

267.

As the Manufacturer Defendants' efforts to expand the market for opioids increased so have the rates of prescription and sale of their products — and the rates of opioid-related substance abuse, hospitalization, and death among the people of the State and West Ascension, the Parish and Plaintiff's Community. The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids into communities like the Parish, State and Plaintiff's Community, fueling the epidemic.

268.

Not only is there is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and

associated adverse outcomes,"[86] the epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[87]

**269.**

Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[88]

**270.**

The increased abuse of prescription painkillers along with growing sales has contributed to a large number of overdoses and deaths. [89]

**271.**

The opioid epidemic has escalated in West Ascension, the Parish and Plaintiff's Community with devastating effects. Substantial opiate-related substance abuse, hospitalization and death mirrors Defendants' increased distribution of opiates.

**272.**

Because of the well-established relationship between the use of prescription opiates and the use of non-prescription opioids, like heroin, the massive distribution of opioids to West Ascension, the Parish and Plaintiff's Community, and areas from which such opioids are being diverted into West Ascension, the Parish and Plaintiff's Community, has caused the Defendant-caused opioid epidemic to include heroin addiction, abuse, and death.

**273.**

Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and in the Parish and Plaintiff's Community.

**274.**

Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and in West Ascension, the Parish and Plaintiff's Community.

**275.**

Defendants repeatedly and purposefully breached their legal duties, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of

---

[86] *See* Richard C. Dart *et al.,* Trends in Opioid Analgesic Abuse and Mortality in the United States, 372 N. Eng. J. Med. 241 (2015).
[87] *See* Robert M. Califf *et al.,* A Proactive Response to Prescription Opioid Abuse, 374 N. Eng. J. Med. 1480 (2016).
[88] *See* Nora D. Volkow & A. Thomas McLellan, Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies, 374 N. Eng. J. Med. 1253 (2016).
[89] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

prescription opioids for nonmedical purposes into West Ascension, the Parish and Plaintiff's Community.

276.

The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the State, Parish, and Plaintiff's Community. This diversion and the epidemic are direct causes of foreseeable harms incurred by the Plaintiff and Plaintiff's Community.

277.

Defendants' intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Plaintiff seeks relief, as alleged herein. Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

278.

Plaintiff seeks economic damages from the Defendants as reimbursement for the costs associated with past efforts to eliminate the hazards to public health and safety and to pay for the cost to permanently eliminate the hazards to public health and safety and abate the temporary public nuisance.

279.

To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed."[90]

280.

A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain.[91]

281.

These community-based problems require community-based solutions that have been limited by budgetary constraints.[92]

---

[90] *See* Rose A. Rudd *et al.*, Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016), at 1145.
[91] *See* Johns Hopkins Bloomberg School of Public Health, The Prescription Opioid Epidemic: An Evidence-Based Approach (G. Caleb Alexander *et al.* eds., 2015), http://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-effectiveness/research/prescription-opioids/JHSPH_OPIOID_EPIDEMIC_REPORT.pdf.
[92] *See* Office of Nat'l Drug Control Policy, Exec. Office of the President, Epidemic: Responding to America's Prescription Drug Abuse Crisis (2011), https://www.ncjrs.gov/pdffiles1/ondcp/rx_abuse_plan.pdf.

**282.**

Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon Plaintiff and Plaintiff's Community.

## VI. DEFENDANTS' FRAUDULENT AND DECEPTIVE MARKETING OF OPIOIDS DIRECTLY CAUSED HARM TO PLAINTIFF.

**283.**

In the first instance, Plaintiff was damaged directly, through its payments of false claims for chronic opioid therapy by (a) its health care plans and (b) its workers' compensation program.

**284.**

The Defendants' marketing of opioids caused health care providers to prescribe and Plaintiff, through its health plans and workers' compensation program, to pay for prescriptions of opioids to treat chronic pain. Because of the Defendants' unbranded marketing, health care providers wrote and Plaintiff paid for prescription opioids for chronic pain that were filled not only with their drugs, but with opioids sold by other manufacturers. All of these prescriptions were caused by Defendants' fraudulent marketing and therefore all of them constitute false claims. Because, as laid out below, Plaintiff is obligated to cover medically necessary and reasonably required care, it had no choice but to pay these false and fraudulent claims.

**285.**

The fact that Plaintiff would pay for these ineligible prescriptions is both the foreseeable and intended consequence of the Defendants' fraudulent marketing scheme. The Defendants set out to change the medical and general consensus supporting chronic opioid therapy so that doctors would prescribe and government payors, such as Plaintiff, would pay for long-term prescriptions of opioids to treat chronic pain despite the absence of genuine evidence supporting chronic opioid therapy and the contrary evidence regarding the significant risks and limited benefits from long-term use of opioids.

### A. Increase in Opioid Prescribing Nationally

**286.**

Defendants' scheme to change the medical consensus regarding opioid therapy for chronic pain worked. During the year 2000, outpatient retail pharmacies filled 174 million prescriptions for opioids nationwide. During 2009, they provided 83 million more.

**287.**

Opioid prescriptions increased even as the percentage of patients visiting the doctor for pain remained constant.

**288.**

A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.[93]

**289.**

Approximately 20% of the population between the ages of 30 and 44 and nearly 30% of the population over 45 have used opioids. Indeed, "[o]pioids are the most common means of treatment for chronic pain."[94] From 1980 to 2000, opioid prescriptions for chronic pain visits doubled. This is the result not of an epidemic of pain, but an epidemic of prescribing. A study of 7.8 million doctor visits found that prescribing for pain increased by 73% between 2000 and 2010 – even though the number of office visits in which patients complained of pain did not change and prescribing of non-opioid pain medications decreased. For back pain alone – one of the most common chronic pain conditions – the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined and referrals to physical therapy remained steady.

**290.**

This increase corresponds with, and was caused by, the Defendants' massive marketing push. The industry's spending nationwide on marketing of opioids stood at more than $20 million per quarter and $91 million annually in 2000. By 2011, that figure hit its peak of more than $70 million per quarter and $288 million annually, a more than three-fold increase. By 2014, the figures dropped to roughly $45 million per quarter and $182 million annually, as the Defendants confronted increased concern regarding opioid addiction, abuse, and diversion. Even so, the Defendants still spend double what they spent in 2000 on opioid marketing.

---

[93] Matthew Daubress *et al.*, Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000–2010, 51 (10) Med. Care 870 (2013).
[94] Deborah Grady *et al.*, Opioids for Chronic Pain, 171 (16) Arch. Intern. Med. 1426 (2011).

**291.**

By far the largest component of this spending was opioid drug makers' detailing visits to individual doctors, with total detailing expenditures more than doubling between 2000 and 2014 and now standing at $168 million annually.

> **B. Plaintiff's Increased Spending on Opioids through Health Care Plan and Worker's Compensation Program.**

**292.**

Commensurate with the Defendants' heavy promotion of opioids and the resultant massive upswing in prescribing of opioids nationally, Plaintiff has seen its own spending on opioids – through claims paid by its health care plan and worker's compensation program – increase dramatically.

> **1. Health Care Plans**

**293.**

Plaintiff provides comprehensive health care benefits, including prescription drugs coverage, to its employees and retirees.

**294.**

Throughout the relevant time period for this action, Plaintiff has incurred health plan prescription drug costs.

**295.**

Plaintiff's applicable health plan provides benefits for all "medically necessary" services associated with opioids, including treatment related to any adverse outcomes from chronic opioid therapy, such as overdose or addiction treatment.

**296.**

The Defendants caused Plaintiff to incur costs under the health plan that were false by: (a) causing doctors to write prescriptions for chronic opioid therapy based on deceptive representations regarding the risks, benefits, and superiority of those drugs; (b) causing doctors to certify that these prescriptions and associated services were medically necessary; (c) causing claims to be submitted for drugs that were promoted for off-label uses and misbranded, and therefore unauthorized; and (d) distorting the standard of care for treatment of chronic pain so that doctors would feel not only that it was appropriate, but required, that they prescribe and continue prescriptions for opioids long-term to treat chronic pain.

76

**297.**

Plaintiff's health plan only covers the cost of prescription drugs that are medically necessary and dispensed for a FDA-approved purpose. Prescriptions drugs that are not medically necessary or that are dispensed for a non-FDA approved purpose are excluded from coverage under Plaintiff's plan. Generally, under any health insurance plan, a medically necessary prescription is one which is "customary for the treatment or diagnosis of an illness or injury, and is consistent with generally accepted medical standards."

**298.**

Doctors who care for Plaintiff employees and retirees and their dependents are bound by the provider agreements that entitle them to participate in Plaintiff's health plan. These agreements generally permit doctors to charge only for treatments that are medically necessary.

**299.**

Plaintiff is obligated to incur costs for the medically necessary treatment of covered employees.

**300.**

In prescribing opioids for chronic pain, doctors certify that the treatment is medically necessary and the drugs dispensed for an FDA approved purpose, and the health plan authorizes payment.

**301.**

As described above, the use of opioids to treat chronic pain is not in accordance with generally accepted standards of medical practice nor clinically appropriate and considered effective for the patient's illness, injury or disease.

**302.**

Further, the Defendants' deceptive marketing rendered opioids misbranded as prescribed for chronic pain because they were false and misleading and because, by minimizing the risks associated with the drugs, they did not contain adequate directions for use. The written, printed, or graphic matter accompanying the Defendants' drugs did not accurately describe the risks associated with long-term use of their products, rendering them misbranded. Due to this misbranding, the Defendants' opioids were not FDA-approved, within the meaning of Plaintiff's health plans, for the long-term treatment of chronic pain.

**303.**

For each and all of the reasons above, chronic opioid therapy and its attendant and consequential costs are not eligible for reimbursement through Plaintiff's health plan. Plaintiff would not have knowingly reimbursed claims for prescription drugs that were not eligible for coverage.

**304.**

As a result of the Defendants' deceptive marketing, Plaintiff's patients who used opioids long-term to treat chronic pain also incurred additional costs and suffered additional injuries requiring care, including doctors' visits, toxicology screens, hospitalization for overdoses, treatment and other adverse effects of opioids, and long-term disability, among others, which caused Plaintiff to incur additional costs.

**305.**

The costs incurred by Plaintiff include, but are not limited to, doctor visits, which would also be included with these prescriptions. This includes prescriptions that also were caused by Defendants' deceptive marketing, including prescriptions for Defendants' generic opioid products and prescriptions for opioids from other manufacturers. The costs incurred also include the cost to Plaintiff of prescribing opioids, such as doctors' visits or toxicology screens, or the costs of treating the adverse effects of prescribing opioids long-term, such as overdose and addiction. They also do not reflect the total damages for all years to Plaintiff, which will be determined at trial, and which will include costs to the health plan for the treatment of opioid abuse and dependency.

**306.**

The claims – and the attendant and consequential costs -- for opioids prescribed for chronic pain, as opposed to acute and cancer or end-of-life pain, were ineligible for payment and the result of the Defendants' deceptive and unfair conduct.

**2. Workers' Compensation Programs**

**307.**

Plaintiff provides workers' compensation, including prescription drug benefits, to eligible employees injured in the course of their employment. Plaintiff is responsible for paying its share of the employee's medical costs and lost wages for work-related injuries.

**308.**

Doctors submit claims to Plaintiff's workers' compensation program for the costs associated with prescribing opioids, including office visits and toxicology screens for patients prescribed opioids.

**309.**

Plaintiff's workers' compensation program covers all costs associated with opioids, including treatment related to any adverse outcomes from chronic opioid therapy, such as addiction treatment.

**310.**

The Defendants cause doctors and pharmacies to submit, and Plaintiff to pay claims to its workers' compensation program that were false by: (a) causing doctors to write prescriptions for chronic opioid therapy based on deceptive representations regarding the risks, benefits, and superiority of those drugs; (b) causing doctors to certify that these prescriptions and associated services were medically necessary; (c) causing claims to be submitted for drugs that were promoted for off-label uses and misbranded, and therefore not FDA-approved; and (d) distorting the standard of care for treatment of chronic pain so that doctors would feel not only that it was appropriate, but required, that they prescribe and continue prescriptions for opioids long-term to treat chronic pain.

**311.**

In prescribing opioids for chronic pain, doctors certify that the treatment is medically necessary and reasonably required, and the workers' compensation program authorizes payment from Plaintiff funds.

**312.**

Plaintiff's workers' compensation program is obligated to cover all "medically necessary" and "reasonably required" treatment arising from compensable work-related injuries.

**313.**

As described above, however, the use of opioids to treat chronic pain is not medically necessary or reasonably required in that their risks do not materially exceed their benefits; they do not improve physiological function; and their use is not consistent with guidelines that are scientifically based (as opposed to marketing driven).

314.

Nevertheless, the amount of such prescriptions paid by worker's compensation programs is monumental. A study of the National Council on Compensation Insurance ("NCCI") concluded that, in 2011, approximately 38% of pharmacy costs in workers' compensation are for opioids and opioid combinations, amounting to approximately $1.4 billion.

315.

Upon information and belief, those trends are reflected in Plaintiff's experience with paying for opioids through its worker's compensation plan.

316.

Plaintiff incurred costs associated with prescribing opioids, such as doctors' visits or toxicology screens, or the costs of treating the adverse effects of prescribing opioids long-term such as overdose and addiction.

317.

However, the costs of long-term opioid use are not limited to costs of opioid prescriptions. Long-term opioid use is accompanied by a host of consequential costs, including costs related to abuse, addiction, and death.

318.

These claims – and their attendant and consequential costs – for opioids prescribed for chronic pain, as opposed to acute and cancer or end-of-life pain, were ineligible for payment and the result of the Defendants' fraudulent scheme.

**3. Plaintiff's Increased Costs Were Caused by Defendants' Promotion.**

319.

Upon information and belief, Defendants' promotional efforts and expenditures were a direct cause of both prescribing rates and the increased cost to Plaintiff to perform its obligations related to its health and workers' compensation plans.

320.

Plaintiff asserts that each Defendant made misrepresentations or misrepresentation by omission of material facts by their employees, agents, or co-conspirators to prescribing physicians who then wrote opioid prescriptions for which the Plaintiff paid. Furthermore, the Plaintiff asserts that specific details about the names of the employees, agents, or co-conspirators, the substance of

the misrepresentations or omissions, the time and date and location of said misrepresentations or omissions, and the names of the prescribing physicians who were exposed to each Defendants' misrepresentations or omissions were closely tracked by the Defendants, are in the exclusive possession of the Defendants and Plaintiff reasonably believes that such information will be disclosed in discovery.

## VII. THE CLAIMS HAVE NOT PRESCRIBED

### 321.

No cause of action alleged herein is subject to a peremptory period.

### 322.

Plaintiff continues to suffer harm from the continuing unlawful actions and omissions by the Defendants.

### 323.

The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants has not ceased. The public nuisance remains unabated. The conduct causing the damages remains unabated.

### 324.

*Contra non valentum* prevented the running of liberative prescription, because Defendants took acts effectually to prevent Plaintiff from availing itself of its causes of actions and, in the alternative, the causes of action were neither known nor reasonably knowable by the Plaintiff even though Plaintiff's ignorance was not induced by the defendants.

### 325.

Defendants undertook active efforts to deceive Plaintiff and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State, the Plaintiff, West Ascension, the Parish and Plaintiff's Community, that they were undertaking efforts to comply with their legal obligations, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits. Defendants affirmatively assured the public, including the State, the Plaintiff, and Plaintiff's Community, that they are working to curb the opioid epidemic.

**326.**

For example, a Cardinal Health executive claimed that it uses advanced analytics to monitor its supply chain, and assured the public it was being as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity.

**327.**

Similarly, McKesson publicly stated that it has a best-in-class controlled substance monitoring program to help identify excessive or unusual orders, and claimed it is deeply passionate about curbing the opioid epidemic in our country.

**328.**

Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Distributor Defendants, through their trade associations, HDMA and NACDS, have made the following statements:[95]

a.  "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

b.  "DEA regulations that have been in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders)."

c.  "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that is available to them in the ordering process."

d.  A particular order or series of orders can raise red flags because of its unusual size, frequency, or departure from typical patterns with a given pharmacy."

e.  "Distributors also monitor for and report abnormal behavior by pharmacies placing orders, such as refusing to provide business contact information or insisting on paying in cash."

Through the above statements made on their behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, the Distributor Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

**329.**

The Distributor Defendants have also concealed and prevented discovery of information, including data from the ARCOS database, which will confirm their identities and the extent of their wrongful and illegal activities.

---

[95] Brief for HDMA and NACDS, 2016 WL 1321983, at *3-4, *25.

**330.**

The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The Manufacturer Defendants invented "pseudoaddiction" and promoted it to an unsuspecting medical community. The Manufacturer Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction. The Manufacturer Defendants recommended to the medical community that dosages be increased, without disclosing the risks. The Manufacturer Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. The medical community, consumers, the State, the Parish, West Ascension and Plaintiff's Community were duped by the Manufacturer Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the State, Parish, West Ascension and in Plaintiff's Community.

**331.**

Defendants intended that their actions and omissions would be relied upon, including by Plaintiff and Plaintiff's Community. Plaintiff and Plaintiff's Community did not know, and did not have the means to know, the truth due to Defendants' actions and omissions.

**332.**

The Plaintiff and Plaintiff's Community reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

**333.**

As alleged herein, Defendants knew of the wrongful acts set forth above, and had material information pertinent to their discovery, and concealed them from the Plaintiff, West Ascension, West Ascension, the Parish and Plaintiff's Community.

**334.**

The Plaintiff did not know, or could not have known through the exercise of reasonable diligence, of its causes of action, as a result of Defendants' conduct, because of (a) defendants' misrepresentations, or, (b) in the alternative, the causes of action were neither known nor

reasonably knowable by the Plaintiff even though Plaintiff's ignorance was not induced by the defendants

**335.**

The purposes of the prescriptive periods, if any, are satisfied because Defendants cannot claim prejudice due to a late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

**336.**

In light of their statements to the media, in legal filings, and settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein.

**337.**

Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, the Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

**<u>LEGAL CAUSES OF ACTION</u>**

**COUNT I:  PUBLIC NUISANCE**

**338.**

Plaintiff incorporates by reference all other paragraphs of this Petition as if fully set forth here, and further alleges as follows.

**339.**

Louisiana has found that a prohibited activity under its public nuisance statutes can include the illegal manufacture, sale or distribution of, or possession with intent to manufacture, sell, or distribute, a controlled dangerous substance, which include opiates.[96] Plaintiff has the right and the power to suppress nuisances.

---

[96] La. Rev. Stat. §§ 13:4711(4)(b); La. Rev. Stat. § 40:961 (26), (27).

84

**340.**

Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injuries.[97]

**341.**

In addition, Defendant McKesson has violated Louisiana's public nuisance statutes by conducting, carrying on and knowingly permitting prohibited activities at its distribution center in St. Rose, Louisiana.[98]

**342.**

By causing dangerously addictive drugs to flood the community, and to be diverted for illicit purposes, in contravention of law, each Defendant has injuriously affected rights common to the general public, specifically including the rights of the people of the Parish, West Ascension and Plaintiff's Community to public health, public safety, public peace, public comfort, and public convenience. The public nuisance caused by Defendants' diversion of dangerous drugs has caused substantial annoyance, inconvenience, and injury to the public.

**343.**

By selling dangerously addictive opioid drugs diverted from a legitimate medical, scientific, or industrial purpose, Defendants have committed a course of conduct that injuriously affects the safety, health, and morals of the people of the Parish, West Ascension and Plaintiff's Community.

**344.**

By failing to maintain a closed system that guards against diversion of dangerously addictive drugs for illicit purposes, Defendants injuriously affected public rights, including the right to public health, public safety, public peace, and public comfort of the people of the Plaintiff's Community.

**345.**

Defendants' wrongful and illegal actions have created a public nuisance. Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable interference with a right common to the general public.

---

[97] *See* Restatement Second, Torts § 821B.
[98] *See* La. Rev. Stat. § 13:4711.

**346.**

The Defendants have intentionally and/or unlawfully created a nuisance.

**347.**

The residents of the Parish, West Ascension and Plaintiff's Community have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

**348.**

Defendants intentionally, unlawfully, and recklessly manufacture, market, distribute, and sell prescription opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to the Parish, West Ascension and Plaintiff's Community, resulting in addiction and abuse, an elevated level of crime, death and injuries to the residents of the Parish, West Ascension and Plaintiff's Community, a higher level of fear, discomfort and inconvenience to the residents of the Parish, West Ascension and Plaintiff's Community, and direct costs to the Parish, West Ascension and Plaintiff's Community.

**349.**

Defendants have unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted such as to injure the Parish, West Ascension and Plaintiff's Community and its residents.

**350.**

Defendants have unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion. Such conduct was illegal. Defendants' failures to maintain effective controls against diversion include Defendants' failure to effectively monitor for excessive or unusual orders, report excessive or unusual orders, and/or stop shipment of excessive or unusual orders.

**351.**

Defendants have caused a significant and unreasonable interference with the public health, safety, welfare, peace, comfort and convenience, and ability to be free from disturbance and reasonable apprehension of danger to person or property.

**352.**

Defendants' conduct in illegally distributing and selling prescription opioids, or causing such opioids to be distributed and sold, where Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used illegally in the Parish, West Ascension and Plaintiff's Community is of a continuing nature.

**353.**

Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

**354.**

A violation of any rule or law controlling the distribution of a drug of abuse in the Parish, West Ascension and Plaintiff's Community and the State is a public nuisance.

**355.**

Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by statute and regulation.

**356.**

Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be illegally distributed and possessed in Plaintiff's Community will be diverted, leading to abuse, addiction, crime, and public health costs.

**357.**

Because of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

**358.**

Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

**359.**

Defendants know, or reasonably should know, that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

**360.**

Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in the Parish, West Ascension and Plaintiff's Community. Defendants are in the business of manufacturing, marketing, selling, and distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under law.

**361.**

Defendants' conduct in marketing, distributing, and selling prescription opioids which the Defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to residents in West Ascension and Plaintiff's Community and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

**362.**

It is, or should be, reasonably foreseeable to defendants that their conduct will cause deaths and injuries to residents in the Parish, West Ascension and Plaintiff's Community, and will otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

**363.**

The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in the Parish, West Ascension and Plaintiff's Community not only causes deaths and injuries, but also creates a palpable climate of fear among residents in the Parish, West Ascension and Plaintiff's Community where opioid diversion, abuse, addiction are prevalent and where diverted opioids tend to be used frequently.

**364.**

Defendants' conduct makes it easier for persons to divert prescription opioids, constituting a dangerous threat to the public.

**365.**

Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' special positions

88

within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

**366.**

The presence of diverted prescription opioids in the Parish, West Ascension and Plaintiff's Community, and the consequence of prescription opioids having been diverted in the Parish, West Ascension and Plaintiff's Community, proximately results in and/or substantially contributes to the creation of significant costs to the Plaintiff and to Plaintiff's Community in order to enforce the law, equip its police force and treat the victims of opioid abuse and addiction.

**367.**

Stemming the flow of illegally distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make the Parish, West Ascension and Plaintiff's Community a safer place to live.

**368.**

Defendants' conduct is a direct and proximate cause of and/or a substantial contributing factor to opioid addiction and abuse in the Parish, West Ascension and Plaintiff's Community, costs borne by Plaintiff's Community and the Plaintiff, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

**369.**

Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the residents of the Parish, West Ascension and Plaintiff's Community, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. Plaintiff has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

**370.**

Defendants created an intentional nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in the Parish, West Ascension and Plaintiff's Community; however, Defendants intentionally and/or unlawfully failed to maintain effective controls against

diversion through proper monitoring, reporting and refusal to fill excessive or unusual orders of opioids. Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill excessive or unusual orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to prevent or stop excessive or unusual orders of opioids, or caused such orders to be shipped. Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading. Such actions were inherently dangerous.

### 371.

Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids or caused such opioids to be distributed without maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of excessive or unusual orders, that the opioids would be diverted, and create an opioid abuse nuisance in the Parish, West Ascension and Plaintiff's Community.

### 372.

Defendants' actions also created a nuisance by acting recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

### 373.

Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

### 374.

The damages available to Plaintiff include, *inter alia*, recoupment of governmental costs, flowing from an ongoing and persistent public nuisance which the government seeks to abate. Defendants' conduct is ongoing and persistent, and Plaintiff seeks all damages flowing from the conduct. Plaintiff further seeks to abate the nuisance and harm created by Defendants' conduct.

### 375.

As a direct result of Defendants' conduct, the Plaintiff, West Ascension and Plaintiff's Community have suffered actual injury and damages including, but not limited to, significant

expenses for police, emergency, health, prosecution, corrections and other services. The Plaintiff here seeks recovery for its own harm.

### 376.

The Plaintiff, West Ascension and Plaintiff's Community have sustained specific and special injuries because its damages include, *inter alia*, health services, law enforcement expenditures, and costs related to opioid addiction treatment and overdose prevention.

### 377.

Plaintiff further seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and interference with a right common to the public.

### 378.

Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* abatement and compensatory damages (including but not limited to incarceration and jail medical expenses) from the Defendants for the creation of a public nuisance, attorney fees and costs, and pre- and post-judgment interest.

### 379.

Defendants' intentional and unlawful actions and omissions and unreasonable interference with a right common to the public are of a continuing nature.

### 380.

Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in the Parish, West Ascension and Plaintiff's Community. Defendants are in the business of manufacturing or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under law as substances posing a high potential for abuse and severe addiction. Defendants created an intentional nuisance. Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

### 381.

The public nuisance created by Defendants' actions is substantial and unreasonable—it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the

Defendants' abdication of their gate-keeping and diversion prevention duties, and the Manufacturer Defendants' fraudulent marketing activities, have caused harm to the entire community that includes, but is not limited to the following:

a.  The high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

b.  Even children have fallen victim to the opioid epidemic. Easy access to prescription opioids made opioids a recreational drug of choice among teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

c.  Even those residents of the Parish, West Ascension and Plaintiff's Community who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gatekeeper duties and fraudulent promotions. Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

d.  The opioid epidemic has increased health care costs.

e.  Employers have lost the value of productive and healthy employees.

f.  Defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

g.  Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h.  The diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement.

i.  The significant and unreasonable interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiff, West Ascension and Plaintiff's Community.

j.  Defendants' interference with the comfortable enjoyment of life in the Parish, West Ascension and Plaintiff's Community is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

### 382.

The Plaintiff, West Ascension and Plaintiff's Community have sustained specific and special injuries because its damages include *inter alia* health services and law enforcement expenditures, as described in this Petition.

### 383.

Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity and fraudulent misrepresentations.

### 384.

Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, expenses to abate the nuisance, restitution, disgorgement of profits, compensatory damages(including but not limited to incarceration and jail

medical expenses), civil penalties and all damages allowed by law to be paid by the Defendants,

attorney fees and costs, and pre- and post-judgment interest.

## COUNT II:  LOUISIANA RACKETEERING ACT

### 385.

Plaintiff incorporates by reference all other paragraphs of this Petition as if fully set forth

herein, and further alleges as follows.

### 386.

Plaintiff has standing to bring this action as a "person who is injured by reason of any

violation of the provisions of R.S. 15:1353." La. Rev. Stat. § 15:1356(E).

### 387.

Louisiana Racketeering Act § 15:1353 provides in pertinent part:

A. It is unlawful for any person who has knowingly received any proceeds derived, directly
or indirectly, from a pattern of racketeering activity to use or invest, whether directly or
indirectly, any part of such proceeds, or the proceeds derived from the investment or use
thereof, in the acquisition of any title to, or any right, interest, or equity in immovable
property or in the establishment or operation of any enterprise. B. It is unlawful for any
person, through a pattern of racketeering activity, knowingly to acquire or maintain,
directly or indirectly, any interest in or control of any enterprise or immovable property. C.
It is unlawful for any person employed by, or associated with, any enterprise knowingly to
conduct or participate in, directly or indirectly, such enterprise through a pattern of
racketeering activity. D. It is unlawful for any person to conspire or attempt to violate any
of the provisions of Subsections A, B, or C of this Section.

### 388.

Under La. R.S. § 15:1352, "racketeering activity" is defined in pertinent part as

"Committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating

another person to commit any crime that is punishable under the following provisions of Title 14

of the Louisiana Revised Statutes of 1950... (63) R.S. 14:70.1 (Medicaid fraud)."

### 389.

Under La. R.S. § 15:1352, "pattern of racketeering" is defined in pertinent part as

"Engaging in at least two incidents of racketeering activity that have the same or similar intents,

results, principals, victims, or methods of commission or otherwise are interrelated by

distinguishing characteristics and are not isolated events."

### 390.

La. R.S. § 15:1356(E) specifically provides:

Any person who is injured by reason of any violation of R.S. 15:1353 shall have a cause
of action against any person engaged in racketeering activity who violates a provision of
R.S. 15:1353. Such injured person shall be entitled to recover three times the actual
damages sustained or ten thousand dollars, whichever is greater. Such person shall also

recover attorney fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred.

**A. Medicaid Fraud**

### 391.

La. R.S. § 14.70.1 provides in pertinent part:

A. The crime of Medicaid fraud is the act of any person who, with the intent to defraud the state or any person or entity through any medical assistance program created under the federal Social Security Act and administered by the Louisiana Department of Health or any other state agency, does any of the following: (1) Presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise. (2) Knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise. (3) Knowingly submits false information for furnishing services or merchandise.

### 392.

At all times relevant to this Petition, Defendants, directly, through their control of third parties, and by acting in concert with third parties committed, attempted to commit, conspired to commit, or solicited other persons to commit violations of La. R.S. § 14:70.1 through acts that intended to defraud the state or other entities by knowingly submitting or causing the submission of false information for the purpose of obtaining authorization for furnishing services or merchandise through a medical assistance program created under the Social Security act and administered by an agency of the state.

### 393.

Defendants' scheme caused prescribers to write prescriptions for opioids to treat chronic pain that were presented to Medicaid for payment. Each claim for reimbursement to the Louisiana State Medicaid program for chronic opioid therapy is the direct result of Defendants' marketing, which presented to prescribers false information about the risks, benefits, and superiority of opioids for the long-term treatment of pain.

### 394.

The misrepresentations made by Defendants and third parties they controlled violated La. R.S. § 40:617 and La. R.S. § 40:625, rendering the drugs misbranded and therefore ineligible for reimbursement by Louisiana Medicaid.

### 395.

The misrepresentations were material because if the public and state agencies had known of the false statements disseminated by Defendants and that doctors, pharmacies, other health care providers, and/ or the health plans certified and/ or determined that opioids were medically necessary and reasonably required based on those false statements, they would have refused to

94

authorize payment for opioid prescriptions. Instead, opioid prescriptions proliferated throughout the state, Parish, West Ascension and Plaintiff's Community via the state Medicaid program and contributed significantly to the widespread epidemic of abuse, addiction, and consequent social harms which have caused damage to Plaintiff.

**396.**

By virtue of the above-described acts, Defendants knowingly made or caused to be made false claims with the intent to induce the state agency to approve and pay such false and fraudulent claims, with the goal of widespread use of Defendant manufacturers' products.

**397.**

By virtue of the above-described acts, Defendants acted in concert with third parties to make misleading statements about the risks, benefits, and superiority of opioids to treat chronic pain. Defendants were aware of the misleading nature of the misstatements and material omissions made by third parties, and yet Defendants provided them substantial assistance and encouragement by helping them develop, refine and promote these misstatements and material omissions and distributing them to a broader audience. Defendants also substantially encouraged the dissemination of these misstatements and material omissions by providing third parties with funding and technical support for the shared purpose of issuing misleading, pro-opioid messaging. Defendants knew or should have known that these marketing and promotional efforts created an untrue, false, and misleading impression about the risks, benefits, and superiority of opioids for chronic pain and would result in the submission of false claims to the state Medicaid program for opioid prescriptions written to treat chronic pain.

**398.**

By reason of the Defendants conspiracy to commit Medicaid fraud and repeated acts of Medicaid fraud, opioid prescriptions have proliferated throughout the state, Parish, West Ascension and Plaintiff's Community, as has opioid and heroin-related crime, and Plaintiff has thereby been injured in that Defendants' unbranded marketing cause the doctors to prescribe and the state Medicaid program to pay for long-term opioid treatment using opioids manufactured or distributed by Defendants, and Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of La. R.S. § 15:1351 as described in this Petition and have used or invested those ill-gotten proceeds, or the proceeds derived from the investment or use thereof in violation of La. R.S. § 15:1351.

Defendants' pattern of racketeering activity has caused an explosion of opioids on the streets throughout the state, Parish, West Ascension and Plaintiff's Community and a rise in opioid and heroin-related use, misuse, abuse, and related crime that have caused harm to Plaintiff including through costs of treatment. Defendants caused and are responsible for those costs and claims, as well as their enrichment.

**B.  Louisiana Uniform Controlled Dangerous Substances Law**

**399.**

The Louisiana Racketeering Act prohibits "committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit any crime that is punishable under . . . the Uniform Controlled Dangerous Substances Law," among other enumerated acts. La. Rev. Stat. § 15:1352(A).

**400.**

Opioids are classified as both Schedule I and Schedule II drugs under Louisiana law. La. Rev. Stat. § 40:964. The Louisiana Uniform Controlled Dangerous Substances Law explicitly provides that "[p]hysical dependence is an expected result of opioid use." La. Rev. Stat. § 40:961(29.1). Unauthorized manufacture, distribution, or dispensing of opioids constitute predicate acts of racketeering activity under the Louisiana Racketeering Act. La. Rev. Stat. § 15:1352(A)(13) (citing La. Rev. Stat. § 40:967(A)).

**401.**

For over a decade, the Racketeering Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, the Racketeering Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. Defendants were legally restricted in their ability to manufacture or distribute Schedule II substances like opioids by requirements that they: (1) register to manufacture or distribute opioids; (2) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; (3) design and operate a system to identify excessive or unusual orders of controlled substances, stop such unlawful sales, and report them; and (4) make sales within a limited quota for the overall production of Schedule II substances like opioids.

**402.**

These requirements were specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from legitimate channels of trade to the illicit market by controlling the quantities of the basic ingredients needed for the manufacture of controlled substances.

**403.**

Finding it impossible to legally achieve their ever increasing sales ambitions, members of the Opioid Diversion Enterprise systematically and fraudulently violated their statutory duty to maintain effective controls against diversion of their drugs, to design and operate a system to identify excessive or unusual orders of their drugs, to halt unlawful sales of excessive or unusual orders, and to report the excessive or unusual orders. As discussed in detail below, through the Racketeering Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers which, in turn, artificially and illegally increased the annual production quotas for opioids allowed. In doing so, the Racketeering Defendants allowed hundreds of millions of pills to enter the illicit market which allowed them to generate obscene profits.

**404.**

Defendants' illegal scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants, and executed in harmony by each of them. In particular, each of the Racketeering Defendants were associated with, and conducted or participated in, the affairs of the Racketeering enterprise (referred to collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in the unlawful sales of opioids, deceive the public and regulators into believing that the Racketeering Defendants were faithfully fulfilling their statutory obligations. The Racketeering Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of ensuring unlawfully increasing revenues, profits, and market share. As a direct result of the Racketeering Defendants' fraudulent scheme, course of conduct, and pattern of Racketeering activity, they were able to extract billions of dollars of revenue from the addicted American public, while entities like the Plaintiff experienced multi-millions of dollars of injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.

The Racketeering Defendants' misconduct violated La. Rev. Stat. § 15:1351 *et. seq.* and Plaintiff are entitled to relief.

**405.**

Alternatively, the Racketeering Defendants were members of a legal entity enterprise through which the Racketeering Defendants conducted their pattern of Racketeering activity in this jurisdiction. Specifically, the Healthcare Distribution Alliance (the "HDA")[99] is a distinct legal entity. The HDA is a non-profit corporation formed under the laws of the District of Columbia and doing business in Virginia.

**406.**

On information and belief, each of the Racketeering Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion Enterprise and to engage in the pattern of Racketeering activity that gives rise to the Count.

**407.**

Each of the Racketeering Defendants is a legal entity separate and distinct from the HDA. And the HDA serves the interests of distributors and manufacturers beyond the Racketeering Defendants. Therefore, the HDA exists separately from the Opioid Diversion Enterprise, and each of the Racketeering Defendants exists separately from the HDA.

**408.**

The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the Racketeering Defendants to conduct the Opioid Diversion Enterprise by engaging in a pattern of Racketeering activity. Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

**1. THE OPIOID DIVERSION ENTERPRISE**

**409.**

Louisiana law imposes duties on manufacturers and distributers of controlled substances.

**410.**

In order to prevent diversion of drugs out of legitimate channels of distribution into the illegal market, the Manufacturers and Distributors Defendants are required to adhere duties

---

[99] Health Distribution Alliance, History, Health Distribution Alliance, (last accessed on September 15, 2017), https://www.healthcaredistribution.org/about/hda-history.

imposed by Louisiana law requiring security, recordkeeping, and monitoring and reporting requirements that are designed to identify or prevent diversion. Manufacturing Defendants are prohibited from manufacturing opioids not authorized and in quantities in excess of authorized quantities. Their failure to fulfill these obligations resulted in the scourge of addiction that has occurred.

**411.**

At all relevant times, the Racketeering Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their statutory duty to identify, investigate, halt and report excessive or unusual orders of opioids and diversion of their drugs into the illicit market, in order to unlawfully increase the quotas and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The Racketeering Defendants conducted their pattern of Racketeering activity in this jurisdiction.

**412.**

The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, per capita purchase of methadone, hydrocodone, and oxycodone increased 13-fold, 4-fold, and 9-fold, respectively. By 2010, enough prescription opioids were sold in the United States to medicate every adult in the county with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[100] On information and belief, the Opioid Diversion Enterprise has been ongoing for at least the last decade.[101]

**413.**

The Opioid Diversion Enterprise was and is a successful endeavor. The Opioid Diversion Enterprise has been conducting business uninterrupted since its genesis. But, it was not until recently that regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the public.

**414.**

At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each Racketeering Defendant; (b) was separate and distinct from the pattern of

---

[100] Keyes KM, Cerdá M, Brady JE, Havens JR, Galea S., *Understanding the rural-urban differences in nonmedical prescription opioid use and abuse in the United States*, AM J PUBLIC HEALTH. 2014;104(2):e52-9.
[101] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

Racketeering in which the Racketeering Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Racketeering Defendants; (d) characterized by interpersonal relationships among the Racketeering Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of Racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting increased production quotas, all so that the Racketeering Defendants would have a larger pool of prescription opioids from which to profit.

**415.**

The Opioid Diversion Enterprise also engaged in efforts to lobby against authority to hold the Racketeering Defendants liable for disregarding their duty to prevent diversion. Members of the Pain Care Forum and the Healthcare Distribution Alliance lobbied for the passage of legislation to weaken the DEA's enforcement authority. The HDA and other members of the Pain Care Forum contributed substantial amounts of money to political lobbying efforts and campaigns for candidates, political action committees and political parties.

**416.**

The Opioid Diversion Enterprise functioned by selling prescription opioids. The Racketeering Defendants, through their illegal enterprise, engaged in a pattern of Racketeering activity, that involves a fraudulent scheme to increase revenue by violating laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of excessive or unusual orders of prescription opioids destined for the illicit drug market. The goal of Defendants' scheme was to increase profits from opioid sales. But, Defendants' profits were limited by production quotas, so the Defendants refused to identify, investigate and/or report excessive or unusual orders of their prescription opioids being diverted into the illicit drug market. The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for Defendants to manufacture and distribute for public consumption.

**417.**

Within the Opioid Diversion Enterprise, there were interpersonal relationships and common communication by which the Racketeering Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the Opioid Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and communication network for the purpose of conducting the enterprise through a pattern of Racketeering activity.

**418.**

Each of the Racketeering Defendants had a systematic link to each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The Racketeering Defendants participated in the operation and management of the Opioid Diversion Enterprise by directing its affairs, as described herein. While the Racketeering Defendants participated in, and are members of, the enterprise, they each have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

**419.**

The Racketeering Defendants exerted substantial control over the Opioid Diversion Enterprise by their membership in the Pain Care Forum, the HDA, and through their contractual relationships.

**420.**

The Pain Care Forum ("PCF") has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped policies regarding the use of prescription opioids for more than a decade.

**421.**

The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug makers <u>and their allies</u> shaped the national response to the ongoing wave of prescription opioid abuse.[102] Specifically, PCF members spent over $740 million

---

[102] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), <u>https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic</u> (emphasis added).

lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[103]

**422.**

Not surprisingly, each of the Racketeering Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.[104] In 2012, membership and participating organizations included the HDA (of which Racketeering Defendants are members), Endo, Purdue, Johnson & Johnson (the parent company for Janssen Pharmaceuticals), Actavis (*i.e.*, Allergan), and Teva (the parent company of Cephalon).[105] Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. But, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[106] Upon information and belief, the Distributor Defendants participated directly in the PCF as well.

**423.**

The 2012 Meeting Schedule for the Pain Care Forum is particularly revealing on the subject of the Defendants' interpersonal relationships. The meeting schedule indicates that meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis, unless otherwise noted. Local members were "encouraged to attend in person" at the monthly meetings. And, the meeting schedule indicates that the quarterly and year-end meetings included a "Guest Speaker."

**424.**

The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the Defendants participated in meetings on a monthly basis, either directly or through their trade organization, in a coalition of drug makers and their allies whose sole purpose was to shape the national response to the ongoing prescription opioid epidemic, including the concerted lobbying efforts that the PCF undertook on behalf of its members.

---

[103] *Id.*
[104] PAIN CARE FORUM 2012 Meetings Schedule, (last updated December 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf
[105] *Id.* Upon information and belief, Mallinckrodt became an active member of the PCF sometime after 2012.
[106] *Id.* The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson Corporation. Executive Committee, Healthcare Distribution Alliance (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/executive-committee.

**425.**

Second, the HDA led to the formation of interpersonal relationships and an organization between the Racketeering Defendants. Although the entire HDA membership directory is private, the HDA website confirms that Distributor Defendants and Manufacturer Defendants, including Actavis (*i.e.*, Allergan), Endo, Purdue, Mallinckrodt and Cephalon were members of the HDA.[107] And, the HDA and each the Distributor Defendants, eagerly sought the active membership and participation of the Manufacturer Defendants by advocating that one of the benefits of membership included the ability to develop direct relationships between Manufacturers and Distributors at high executive levels.

**426.**

In fact, the HDA touted the benefits of membership to the Manufacturer Defendants, advocating that membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[108] Clearly, the HDA and the Distributor Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships between the Manufacturers and Defendants.

**427.**

The application for manufacturer membership in the HDA further indicates the level of connection that existed between the Racketeering Defendants.[109] The manufacturer membership application must be signed by a senior company executive, and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company. The HDA application also requests that the manufacturer identify its current distribution information and its most recent year end net sales through any HDA distributors, including but not limited to, Defendants AmerisourceBergen, Cardinal Health, and McKesson.[110]

---

[107] Manufacturer Membership, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/membership/manufacturer.
[108] Manufacturer Membership Benefits, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en.
[109] Manufacturer Membership Application, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en.
[110] *Id.*

**428.**

After becoming members, the Distributors and Manufacturers were eligible to participate

on councils, committees, task forces and working groups, including:

a.  Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."
b.  Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes distributors and manufacturer members.
c.  Health, Beauty and Wellness Committee: "This committee conducts research, as well as creates and exchanges industry knowledge to help shape the future of the distribution for health, beauty and wellness/consumer products in the healthcare supply chain." Participation in this committee includes distributors and manufacturer members.
d.  Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributors and manufacturer members.
e.  Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.
f.  Bar Code Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.
g.  eCommerce Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.
h.  ASN Working Group: Participation includes Distributor, Manufacturer and Service Provider Members.
i.  Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation includes Distributor and Manufacturer Members. [111]

**429.**

The councils, committees, task forces and working groups provided the Manufacturer and

Distributor Defendants with the opportunity to work closely together in shaping their common

goals and forming the enterprise's organization.

**430.**

The HDA also offers a multitude of conferences, including annual business and leadership

conferences. The HDA and the Distributor Defendants advertise these conferences to the

Manufacturer Defendants as an opportunity to "bring together high-level executives, thought

leaders and influential managers . . . to hold strategic business discussions on the most pressing

---

[111]Councils and Committees, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/councils-and-committees

industry issues."[112] The conferences also gave the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[113] The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership. And, it is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[114]

**431.**

Third, the Racketeering Defendants maintained their interpersonal relationships by working together and exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

**432.**

The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids.[115] As reported in the Washington Post and acknowledged by the HDA, there is an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or chargebacks on their prescription opioid sales.[116] On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[117] The Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell the prescription opioids.

**433.**

The contractual relationships among the Racketeering Defendants also include vault security programs. The Racketeering Defendants are required to maintain certain security

---

[112] Business and Leadership Conference – Information for Manufacturers, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers.
[113] Id.
[114] 2015 Distribution Management Conference and Expo, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-distribution-management-conference.
[115] Lenny Bernstein & Scott Higham, *The government's struggle to hold opioid manufacturers accountable*, Wash. Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356; *see also*, Letter from Sen. Claire McCaskill, (July 27, 2017),
[116] Id.
[117] Webinars, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

protocols and storage facilities for the manufacture and distribution of their opiates. Upon information and belief, manufacturers negotiated agreements whereby the Manufacturers installed security vaults for Distributors in exchange for agreements to maintain minimum sales performance thresholds. Upon information and belief, these agreements were used by the Racketeering Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

**434.**

Taken together, the interaction and length of the relationships between and among the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry. The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The Racketeering Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care Forum are but two examples of the overlapping relationships, and concerted joint efforts to accomplish common goals and demonstrates that the leaders of each of the Racketeering Defendants was in communication and cooperation.

**435.**

According to articles published by the Center for Public Integrity and The Associated Press, the Pain Care Forum – whose members include the Manufacturers and the Distributors' trade association – has been lobbying on behalf of the Manufacturers and Distributors for "more than a decade."[118] And, from 2006 to 2016 the Distributors and Manufacturers worked together through the Pain Care Forum to spend over $740 million lobbying in the nation's capital and in all 50 statehouses, including Louisiana, on issues including opioid-related measures.[119] Similarly, the HDA has continued its work on behalf of Distributors and Manufacturers, without interruption, since at least 2000, if not longer.[120]

**436.**

As described above, the Racketeering Defendants began working together as early as 2006 through the Pain Care Forum and/or the HDA to promote the common purpose of their enterprise.

---

[118] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.
[119] *Id.*
[120] HDA History, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/hda-history.

Upon information and belief, the Racketeering Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

## 2. CONDUCT OF THE OPIOID DIVERSION ENTERPRISE

### 437.

During the time period alleged in this Petition, the Racketeering Defendants exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by fraudulently failing to comply with their obligations to identify, investigate and report excessive or unusual orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, to halt such unlawful sales and, in doing so, to increase production quotas and generate unlawful profits, as follows:

### 438.

Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to maintain effective controls against diversion of their prescription opioids.

### 439.

Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligations to design and operate a system to disclose excessive or unusual orders of their prescription opioids.

### 440.

Defendants disseminated false and misleading statements to the public claiming that they were complying with their obligation to report any excessive or unusual orders or diversion of their prescription opioids.

### 441.

Defendants paid nearly $800 million dollars to influence governments through joint lobbying efforts as part of the Pain Care Forum. The Racketeering Defendants were all members of their Pain Care Forum either directly or indirectly through the HDA. The lobbying efforts of the Pain Care Forum and its members included efforts to pass legislation making it more difficult for the authorities to sanction Manufacturers' and Distributors' for failure to report excessive or unusual orders of opioids.

**442.**

The Racketeering Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

**443.**

The Racketeering Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Upon information and belief, the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured. And, upon information and belief, the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

**444.**

The Manufacturer Defendants lobbied to increase aggregate production quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were excessive or unusual and involved the diversion of opioids that had not been properly investigated or reported by the Racketeering Defendants.

**445.**

The Distributor Defendants developed "know your customer" questionnaires and files. This information was intended to help the Racketeering Defendants identify excessive or unusual orders or customers who were likely to divert prescription opioids.[121] On information and belief, the "know your customer" questionnaires informed the Racketeering Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of excessive or unusual orders.

**446.**

The Racketeering Defendants refused to identify, investigate and report excessive or unusual orders when they became aware of the same despite their actual knowledge of drug

---

[121] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf); Richard Widup, Jr., Kathleen H. Dooley, Esq. Pharmaceutical Production Diversion: Beyond the PDMA, Purdue Pharma and McQuite Woods LLC, (available at https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

diversion rings. The Racketeering Defendants refused to identify excessive or unusual orders and diverted drugs.

**447.**

Defendants' scheme had decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control governmental response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion, and identify excessive or unusual orders and report them to authorities.

**448.**

The Racketeering Defendants worked together to control the flow of information and influence governments and political candidates to pass legislation that was pro-opioid. The Manufacturer and Distributor Defendants did this through their participation in the Pain Care Forum and Healthcare Distributors Alliance.

**449.**

The Racketeering Defendants also worked together to ensure that the aggregate production quotas, individual quotas and procurement quotas stayed high and ensured that excessive or unusual orders were not reported. By not reporting excessive or unusual orders or diversion of prescription opioids, the Racketeering Defendants ensured production quotas for prescription opioids would not be affected due to diversion of excessive or unusual orders. The Racketeering Defendants influenced the production quotas in the following ways:

a. The Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the Pain Care Forum;

b. The Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, including on the councils, committees, task forces, and working groups;

c. The Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioid prescriptions filled by the Distributor Defendants;

d. The Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

e. The Manufacturer Defendants obtained sales information from QuintilesIMS (formerly IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids."[122]

f. The Distributor Defendants accepted rebates and chargebacks for orders of prescription opioids;

g. The Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the Distributor Defendants to focus their distribution efforts to specific areas where the purchase of prescription opioids was most frequent;

---

[122] Harriet Ryan, *et al.*, *More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew*, LOS ANGELES TIMES (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/

h. The Racketeering Defendants identified excessive or unusual orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were excessive or unusual and/or being diverted into the illicit drug market;

i. The Racketeering Defendants refused to report excessive or unusual orders of prescription opioids  despite repeated investigation and punishment of the Distributor Defendants for failure to report excessive or unusual orders; and

j. The Racketeering Defendants withheld information regarding excessive or unusual orders and illicit diversion because it would have revealed that the medical need for and the net disposal of their drugs did not justify the production quotas.

**450.**

The scheme devised and implemented by the Racketeering Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, and all designed and operated to ensure the continued unlawful sale of controlled substances.

### 3. VIOLATIONS

**451.**

The Racketeering Defendants violated section 15:1353 of the Louisiana Racketeering Act by knowingly, intentionally, and unlawfully aiding and abetting each other to commit violations of the Louisiana Uniform Controlled Dangerous Substances Law.

**452.**

The Racketeering Defendants also violated section 15:1353 of the Louisiana Racketeering Act by knowingly receiving "proceeds derived, directly or indirectly, from a pattern of racketeering activity to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in immovable property or in the establishment or operation of any enterprise." La. Rev. Stat. § 15:1353(A).

**453.**

The Racketeering Defendants conducted the Opioid Diversion Enterprise, as defined above, through a pattern of racketeering activity in violation of Section 15:1353(C) and have conspired to violate Section 15:1353(C) in violation of Section 15:1353(D). La. Rev. Stat. § 15:1353.

**454.**

The Racketeering Defendants violated Section 15:1353(D) by knowingly, intentionally, and unlawfully aiding and abetting each other and the Opioid Diversion Enterprise and conspired to conduct and participate, directly and indirectly, in the conduct of the Opioid Diversion

Enterprise, through the pattern of racketeering activity described herein. La. Rev. Stat. § 15:1353(D).

**455.**

The Racketeering Defendants' Opioid Diversion Enterprise existed as an "enterprise" as defined in Section 15:1352(B). The Racketeering Defendants' Opioid Diversion Enterprise existed as an association in fact and included unlawful as well as lawful enterprises. La. Rev. Stat. § 15:1352(B).

**456.**

As described above and as fully incorporated herein, the violations set forth herein constitute "racketeering activity" within the meaning of sections 15:1352(C) and 15:1353 with at least two such acts of racketeering activity having occurred within the past five years.

**457.**

The Racketeering Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property because Plaintiff paid for costs associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference.

**458.**

Plaintiff's injuries, and those of the citizens of the Parish, West Ascension and Plaintiff's Community, were proximately caused by the Racketeering Defendants' racketeering activities. But for the Racketeering Defendants' conduct, Plaintiff would not have paid the health services and law enforcement services and expenditures required as a result of the plague of drug-addicted residents.

**459.**

Plaintiff's injuries and those of her citizens were directly caused by the Racketeering Defendants' racketeering activities.

**460.**

Plaintiff was most directly harmed and there is no other Plaintiff better suited to seek a remedy for the economic harms at issue here.

**461.**

The latest Racketeering incident occurred within five years of the commission of a prior incident of Racketeering.

**462.**

Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest. La. Rev. Stat. § 15:1356(E).

**463.**

Plaintiff respectfully request that this Court enter an order (a) awarding judgment in favor of Plaintiff and against Defendants on Count Two of the Petition; (b) compelling Defendants to pay three times the damages sustained by Plaintiff as a result of Defendants' fraud and pattern of racketeering activity; (c) compelling Defendants to pay the cost of the suit and investigation, including attorneys' fees; and (d) awarding Plaintiff such other, further, and different relief as this Honorable Court may deem just.

## COUNT III:  LOUISIANA PRODUCTS LIABILITY ACT

**464.**

Plaintiff incorporates by reference all other paragraphs of this Petition as if fully set forth here, and further alleges as follows.

**465.**

Pursuant to the Louisiana Product Liability Act, a "manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." La. Rev. Stat. § 9:2800.54(A).

**466.**

A product is "unreasonably dangerous" if, *inter alia*, "an adequate warning about the product has not be provided." La. Rev. Stat. § 9:2800.54(B).

**467.**

Pursuant to section 9:2800.57, a "product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." La. Rev. Stat. § 9:2800.57.

**468.**

An adequate warning is one "that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage." La. Rev. Stat. § 9:2800.53(9).

**469.**

The Manufacturer Defendants, at all times, have manufactured and sold prescription opioids.

**470.**

The Manufacturer Defendants had a duty to provide doctors, patients, Plaintiff, the Parish, West Ascension. and Plaintiff's Community with accurate information regarding the risks of prescription opioids.

**471.**

The Manufacturer Defendants had a duty to warn doctors, patients, Plaintiff, the Parish, West Ascension. and Plaintiff's Community about the risks of prescription opioids.

**472.**

The Manufacturer Defendants, at all times, purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of prescription opioid drugs.

**473.**

However, these warnings were inadequate.

**474.**

As alleged herein, each Manufacturer Defendant wrongfully represented that the opioid prescription medications they manufactured, marketed, and sold had characteristics, uses, or benefits that they do not have.

**475.**

The Manufacturer Defendants also wrongfully misrepresented that the opioids were safe and effective when such representations were untrue, false, and misleading.

**476.**

The Manufacturer Defendants also used exaggeration and/or ambiguity as to material facts and omitted material facts, which tended to deceive and/or did in fact deceive doctors, patients, Plaintiff, the Parish, West Ascension. and Plaintiff's Community.

**477.**

The Manufacturer Defendants made deceptive representations about the use of opioids to treat chronic non-cancer pain. Each Manufacturer Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. Each Manufacturer Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

**478.**

Instead, each Manufacturer Defendant has conducted, and has continued to conduct, a marketing scheme designed to persuade doctors, patients, Plaintiff, the Parish, West Ascension. and Plaintiff's Community that opioids can and should be used for chronic pain. In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.

**479.**

Because of the dangerously addictive nature of these drugs, which the Manufacturer Defendants concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, Manufacturer Defendants' sales and marketing of opioids constituted a violation of State law.

**480.**

In addition, the Manufacturer Defendants have made false and misleading claims, including, *inter alia*, downplaying the serious risk of opioid addiction and abuse; creating and promoting the misleading concept of "pseudoaddiction" and advocating that the signs of addiction should be treated with more opioids; exaggerating the effectiveness of screening tools to prevent addiction; claiming that opioid dependence and withdrawal are easily managed; mischaracterizing the difficulty of discontinuing opioid therapy; denying the risks of higher opioid dosages; and

exaggerating the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction.

**481.**

The Manufacturer Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life.

**482.**

The Manufacturer Defendants disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Manufacturer Defendants recruited for their support of their marketing messages, and through unbranded marketing and industry-funded Front Groups.

**483.**

The Manufacturer Defendants' warnings about prescription opioids were inadequate because they failed to give doctors, patients, Plaintiff, the Parish, West Ascension. and Plaintiff's Community the information needed to contemplate and understand the dangers opioids posed. In fact, the Manufacturer Defendants' statements and actions purported to inform doctors, patients, Plaintiff, the Parish, West Ascension. and Plaintiff's Community that prescription opioids were safe when they were not, or at least were safer than they actually were.

**484.**

The Manufacturer Defendants knew at all times that the prescription opioids that left their control had characteristics, *inter alia*, such as a far greater likelihood for addiction, that could cause damage, and failed to use reasonable care to adequately warn doctors, patients, Plaintiff, the Parish, West Ascension. and Plaintiff's Community of these dangers.

**485.**

This failure to warn doctors, patients, Plaintiff, the Parish, West Ascension. and Plaintiff's Community of the dangers of prescription opioids made the Manufacturer Defendants' product unreasonably dangerous under the Louisiana Products Liability Act.

**486.**

Moreover, the Manufacturer Defendants specifically failed to warn doctors of the risks associated with the use of prescription opioids and instead conducted a marketing scheme designed to persuade doctors that opioids can and should be used for chronic pain and trivialized the risks of opioids. These risks were not otherwise known to doctors because the Manufacturer Defendants

informed them, via scientific publications, treatment guidelines, CME programs, and medical conferences and seminars, that opioids were safer than they in fact were.

**487.**

If the Manufacturer Defendants had properly warned doctors about the dangers of prescription opioids, doctors would have changed their actions in prescribing opioids to certain patients, in the amounts of prescription opioids they prescribed, and in identifying and treating signs of addiction. But for the Manufacturer Defendants' misrepresentations and failure to warn doctors about the actual risks of prescription opioids, doctors would have recognized the risks associated with these drugs, prescribed them less or not at all, and understood the signs of addiction.

**488.**

If the Manufacturer Defendants had properly warned about the dangers of prescription opioids, doctors and patients would have used opioids in such a manner as to avoid the risks of, *inter alia*, addiction, over-prescription, and prescription for chronic pain and other non-indicated conditions.

**489.**

The injuries alleged by Plaintiff herein were sustained as a direct and proximate cause of the Manufacturer Defendants' failure to provide an adequate warning about the dangers of prescription opioids to doctors, patients, Plaintiff, the Parish, West Ascension. and Plaintiff's Community.

**490.**

Plaintiff's injuries and those of her citizens were directly caused by the Manufacturer Defendants' failure to warn.

**491.**

Plaintiff's injuries and those of her citizens arose from reasonably anticipated uses of prescription opioids.

**492.**

Plaintiff seeks economic losses (direct, incidental, and/or consequential pecuniary losses) resulting from Defendants' violations of Louisiana Product Liability Act, including their failure to provide adequate warnings about the dangers of prescription opioids. La. Rev. Stat. § 9:2800.53(5).

## COUNT IV: REDHIBITION

### 493.

Plaintiff incorporates by reference all other paragraphs of this Petition as if fully set forth here, and further alleges as follows.

### 494.

Pursuant to Louisiana Civil Code 2520 *et. seq.*, Defendants, through their manufacture, marketing, sales, and/or distribution of prescription opioids, warranted to doctors, patients, and Plaintiff that these opioids were free of redhibitory defects.

### 495.

Defendants owed a duty to Plaintiff, as a buyer of prescription opioids through its payments of claims for chronic opioid therapy and related claims by its health care plans and its workers' compensation program, that the prescription opioids would be free from redhibitory defects.

### 496.

Plaintiff, as a purchaser of the prescription opioids, had no knowledge of the defects and could not have discovered the defects. The redhibitory defects in the prescription opioids were neither known nor apparent to Plaintiff.

### 497.

The risk of addiction from opioid use and inability of opioids to treat non-cancer chronic pain are redhibitory defects that rendered Defendants' prescription opioids totally or at least partially useless for their intended purposes.

### 498.

Plaintiff would not have paid for the prescription opioids through their payments of claims for chronic opioid therapy and related claims by their health care plans and their workers' compensation program if it had known of their redhibitory defects.

### 499.

Defendants had actual knowledge that the prescription opioids they manufactured, marketed, sold, and/or distributed had redhibitory defects but omitted to inform doctors, patients and Plaintiff of these defects.

### 500.

Instead, Defendants falsely declared that prescription opioids were safe and effective when Defendants knew they were not.

117

**501.**

The redhibitory defects existed at the time Plaintiff purchased and paid for the prescription opioids.

**502.**

But for Defendants' false representations and omissions about the uses of prescription opioids, Plaintiff would not have purchased and paid for these prescriptions through its health care plan and its workers' compensation program.

**503.**

Defendants breached their warranty of redhibition which directly and proximately caused Plaintiff to suffer the damages alleged herein.

**504.**

Due to the redhibitory defects in the prescription opioids, Plaintiff are entitled to and does demand a rescission of all sales of prescription opioids paid for through its self-insured health care plan and its workers' compensation program, including legal interest thereon paid from the date of sale as allowed by law. Defendants are liable to Plaintiff for all amounts spent by Plaintiff with interest from the time of purchase, as well as reimbursement for the reasonable expenses occasioned by the sale and for all related damages, including consequential damages, costs and attorney fees. *See* La. Civ. Code art. 2545.

**505.**

Plaintiff seeks economic losses (direct, incidental, and/or consequential pecuniary losses) resulting from the Defendants' breach of the warranty of redhibition. Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by the Defendants' actions.

**506.**

Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* restitution, compensatory damages, attorney fees and costs, and pre- and post-judgment interest.

**COUNT V: FALSE ADVERTISING**

**507.**

Plaintiff incorporates the allegations within all prior paragraphs within this Petition as if they were fully set forth herein.

**508.**

Louisiana Revised Statute § 40:625(A) states that "An advertisement of a...drug...is false if it is false or misleading in any particular regarding the...drug...Any representation concerning any effect of a drug...is false under this Sub-section if it is not supported by demonstrable scientific facts or substantial and reliable medical or scientific opinion."

**509.**

"Advertisement" includes all representations of fact or opinion disseminated to the public in any manner, or by any means other than labelling. La. R.S. § 40:602.

**510.**

Defendants violated La. R.S. § 40:625, because they engaged in false advertising in the conduct of a business, trade, or commerce in this state.

**511.**

At all times relevant to this Petition, Defendants, directly, through their control of third parties, and by aiding and abetting third parties, violated La. R.S. § 40:625 by making and disseminating untrue, false, and misleading advertisements to Louisiana consumers to promote the sale and use of opioids to treat chronic pain, and by causing untrue, false, and misleading advertisements about opioids to be made or disseminated to Louisiana consumers in order to promote the sale and use of opioids to treat chronic pain. These untrue, false, and misleading statements in advertisements and other patient brochures included, but were not limited to:

    a.  Misrepresenting the truth about how opioids lead to addiction;
    b.  Misrepresenting that opioids improve function;
    c.  Misrepresenting that addiction risk can be managed;
    d.  Misleading patients through the use of misleading terms like "pseudoaddiction";
    e.  Falsely claiming that withdrawal is simply managed;
    f.  Misrepresenting that increased doses pose no significant additional risks; and
    g.  Falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

**512.**

At all times relevant to this Petition, Defendants, directly, through their control of third parties, and by aiding and abetting third parties, also violated La. R.S. § 40:625 through misleading advertisements in various marketing channels, including but not limited to: advertisements, brochures, and other patient education materials that omitted or concealed material facts to promote the sale and use of opioids to treat chronic pain. Defendants and their third-party allies repeatedly failed to disclose or minimized material facts about the risks of opioids, including the risk of addiction, and their risks compared to alternative treatments. Such material omissions were

deceptive and misleading in their own right, and further rendered even otherwise truthful statements about opioids untrue, false, and misleading, creating a misleading impression of the risks, benefits, and superiority of opioids for treatment of chronic pain.

**513.**

Defendants knew at the time of making or disseminating these misstatements and material omissions, or causing these misstatements and material omissions statements to be made or disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public. In addition, Defendants knew or should have known that their marketing and promotional efforts created an untrue, false, and misleading impression of the risks, benefits, and superiority of opioids.

**514.**

In sum, Defendants: (a) directly engaged in untrue, false, and misleading advertising; (b) disseminated the untrue, false, and misleading advertisements through third parties; and (c) aided and abetted the untrue, false, and misleading advertising by third parties.

**515.**

All of this conduct, separately and collectively, was intended to deceive Louisiana consumers who used or paid for opioids for chronic pain and Louisiana payors, including Plaintiff, who incurred expenses and/or costs related to the purchase of, opioids for chronic pain; and the political subdivisions of the state, charged with promoting health, safety and welfare who bore increased costs associated with foreseeable opioid use, misuse, abuse, and criminal activity arising from the rise in addiction that was a direct consequence of Defendants' promotion of misleading advertisements about opioid risks and benefits.

**516.**

By reason of the foregoing, Plaintiff was injured and continues to be injured in that Defendants' false advertisements that caused consumers to request, doctors to prescribe, and payors such as Plaintiff to pay for long-term opioid treatment and using opioids manufactured or distributed by Defendants and other drug makers that they would not have otherwise paid for were it not for Defendants' false advertising. But for Defendants' false advertising, Plaintiff would not have incurred increased law enforcement and social services costs associated with addiction and criminal activity directly attributable to Defendants' misconduct. Defendants caused and are

responsible for those costs and claims. Plaintiff has been injured by reason of Defendants' violation of La. R.S. § 40:625.

517.

Plaintiff respectfully requests that this Court enter an order (a) awarding judgment in favor of Plaintiff and against Defendants on Count Five of the Petition; (b) awarding Plaintiff his actual or compensatory damages; (c) awarding Plaintiff such other, further, and different relief as this Honorable Court may deem just.

COUNT VI: MISBRANDING DRUGS OR DEVICES

518.

Plaintiff incorporates the allegations within all prior paragraphs within this Petition as if they were fully set forth herein.

519.

Louisiana Revised Statute § 40:617(A)(2) states that a drug is considered misbranded if it "is dangerous to health under the conditions of use prescribed in the labeling or advertising thereof . . . ."

520.

Additionally, in Louisiana, a manufacturer illegally "misbrands" a drug is the drug's labeling is false or misleading. La. R.S. § 40:617(A).

521.

"Labeling" includes all labels and other written, printed, and graphic matter, in any form whatsoever, accompanying any drug. La. R.S. § 40:602.

522.

Any representation concerning any effect of a drug is considered false if the representation is not supported by demonstrable scientific facts, or substantial and reliable medical or scientific opinion. La. R.S. § 40:617.

523.

Defendants violated La. R.S. § 40:617, because they misbranded drugs in the conduct of a business, trade or commerce in this state.

524.

By falsely promoting the message, *inter alia,* that opioids were unlikely to lead to addiction; that the rare incidence of addiction could be easily managed; that opioids were

121

appropriate and first-line treatment for chronic pain; that withdrawal is easily managed; that increased doses of opioids posed no additional risks; and by falsely omitting or minimizing the adverse effects of opioids, Defendants and their third-party allies promoted a product that was dangerous to health under the conditions and use prescribed in their advertisements and marketing and therefore misbranded.

**525.**

Defendants also violated La. R.S. § 40:617, because Defendants and their third-party allies promoted a product through advertising and marketing was not supported by demonstrable scientific facts or substantial and reliable medical or scientific opinion, thereby rendered their drugs misbranded. Defendants' misbranding was achieved through the promulgation of false and misleading advertising and marketing, *inter alia*, that opioids were unlikely to lead to addiction; that rare incidence of addiction could be easily managed; that opioids were appropriate and first-line treatment for chronic pain; that withdrawal is easily managed; that increased doses of opioids posed no additional risks, and by falsely omitting or minimizing the adverse effects of opioids, in their advertising and marketing efforts.

**526.**

By reason of the foregoing, Plaintiff was injured and continues to be injured in that Defendants offered drugs dangerous to health under the use prescribed in their labeling and in that Defendants' labeling contained representations that were not supported by demonstrable scientific facts, or substantial and reliable medical or scientific opinion. Such labeling caused consumers to request, doctors to prescribe, and payors such as Plaintiff to pay for long-term opioid treatment using opioids manufactured or distributed by Defendants as well as other drug makers that they would not have otherwise paid for were it not for Defendants' misbranding. But for Defendants' faulty labeling, Plaintiff would not have occurred increased law enforcement and social services costs associated with addiction and criminal activity directly attributable to Defendants' misbranding. Defendants caused and are responsible for those costs and claims. Plaintiff has been injured by reason of Defendants' violation of La. R.S. § 40:617.

**527.**

Plaintiff respectfully requests that this Court enter an order (a) awarding judgment in favor of Plaintiff and against Defendants on Count Six of the Petition; (b) awarding Plaintiff his actual

or compensatory damages; (c) awarding Plaintiff such other, further, and different relief as this Honorable Court may deem just.

## COUNT VII

## LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW,

### La. Rev. Stat. §§ 51:1401, *et. seq.*

#### 528.

Plaintiff incorporates by reference all other paragraphs of this Petition as if fully set forth here, and further alleges as follows.

#### 529.

Plaintiff bring this count under the Louisiana Unfair Trade Practices Act ("LUTPA"), La. Rev. Stat. §§ 51:1401 *et. seq.,* as Plaintiff is a "legal entity" and therefore a "person" under the definitions of the LUTPA. See La. Rev. Stat. § 51:1402(8).

#### 530.

La. Rev. Stat. § 51:1409(A) allows any person who suffers any ascertainable loss of money or property "as a result of the use of employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405" to bring an action to recover actual damages.

#### 531.

Under the LUTPA, "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." La. Rev. Stat. § 51:1405.

#### 532.

The Defendants committed repeated and willful unfair or deceptive acts or practices in the conduct of commerce.

#### 533.

Each Distributor Defendant failed to report and/or prevent the diversion of highly addictive prescription drugs to illegal sources.

#### 534.

Because of the dangerously addictive nature of these drugs, the Defendants' marketing, sales, and/or distribution practices unlawfully caused an opioid and heroin plague and epidemic in the State, Parish and Plaintiff's Community.

**535.**

Each Distributor Defendant had a non-delegable duty to guard against and prevent the diversion of prescription opioids to other than legitimate medical, scientific, and industrial channels.

**536.**

The Distributor Defendants failed to disclose the material facts that *inter alia* they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion, protect against addiction and severe harm, and specifically monitor, investigate, report, and refuse excessive or unusual orders. But for these material factual omissions, the Distributor Defendants would not have been able to sell opioids, and the Distributor Defendants would not have been able to receive and renew licenses to sell opioids.

**537.**

As evidenced by the conduct detailed above, the Distributor Defendants' deceptive trade practices specifically include, but are not necessarily limited to, the following:

a.  The practice of not monitoring for excessive or unusual orders of prescription opioids;
b.  The practice of not detecting excessive or unusual orders of prescription opioids;
c.  The practice of not investigating excessive or unusual orders of prescription opioids;
d.  The practice of filling, or failing to refuse fulfillment of, excessive or unusual orders of prescription opioids;
e.  The practice of not reporting excessive or unusual orders of prescription opioids;
f.  The practice of rewarding increases in prescription opioid sales; and/or
g.  The practice of falsely misrepresenting to the public that Defendants were complying with their legal obligations.

**538.**

The Defendants' unfair, deceptive, and unconscionable representations, concealments, and omissions were reasonably calculated to deceive the public, the Parish, Plaintiff's Community, and Plaintiff.

**539.**

As described more specifically above, the Defendants' representations, concealments, and omissions constitute a willful course of conduct which continues to this day.

**540.**

The damages which Plaintiff seeks to recover were sustained as a direct and proximate cause of the Defendants' intentional and/or unlawful actions and omissions.

**541.**

The Defendants' actions and omissions in the course of marketing, selling, and distributing prescriptions opioids constitute deceptive trade practices under the LUTPA.

**542.**

State law prohibits representing that goods or services have sponsorship, approval, characteristics, uses, or benefits that they do not have. State law further prohibits representing that goods are of a standard, quality, or grade if they are of another.

**543.**

The Defendants egregiously, knowingly, willfully and/or unlawfully engaged in the deceptive trade practices described herein.

**544.**

The Defendants' actions offend established public policy.

**545.**

The Defendants' actions were unethical, unscrupulous and substantially injured consumers, Plaintiff, the Parish and Plaintiff's Community.

**546.**

The Distributor Defendants' unfair practices, as described above, offend deep-seated public policies under Louisiana law, *e.g.* 46 La. Admin. Code. Pt XCI, § 313; *see also* La. Rev. Stat. § 40:974(A)(1) & (A)(4)), to maintain effective controls against diversion and to monitor, detect, investigate, refuse to fill, and report excessive or unusual orders of prescription opioids originating from the State, Parish, and Plaintiff's Community as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted into the State, Parish, and Plaintiff's Community. Nevertheless, by engaging in the conduct alleged above, the Distributor Defendants actively worked to conceal the risk of addiction related to opioids from Louisiana patients and prescribers in the hopes of selling greater quantities of their dangerous drugs. The Distributor Defendants also worked to undermine public policy, enshrined by regulations contained in law, that are aimed at ensuring honest marketing and safe and appropriate use of pharmaceutical drugs.

**547.**

Plaintiff has been damaged, and is likely to be further damaged in the future, by the deceptive trade practices described herein.

**548.**

The Defendants egregiously, knowingly and willfully engaged in the deceptive trade practices described herein.

**549.**

Section 51:1409(A) of the LUTPA empowers this Court to grant treble damages, as well as costs and attorneys' fees against the Distributor Defendants, if the Court finds that Defendants knowingly engaged in an unfair or deceptive trade practice.

**550.**

Plaintiff seeks economic losses (direct, incidental, and/or consequential pecuniary losses) resulting from the Defendants' deceptive trade practices. Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by the Defendants' actions.

**551.**

Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* restitution, disgorgement of profits, compensatory damages, treble damages, attorney fees and costs, and pre- and post-judgment interest.

## COUNT VIII:  NEGLIGENCE AND NEGLIGENT MISREPRESENTATION

**552.**

Plaintiff incorporates by reference all other paragraphs of this Petition as if fully set forth here, and further alleges as follows.

**553.**

Plaintiff seeks economic damages which were the foreseeable result of the Defendants' intentional and/or unlawful actions and omissions.

**554.**

Defendants violated Louisiana Civil Code articles 2315 and 2316 by their negligence and negligent misrepresentations.

**555.**

Article 2315 of the Louisiana Civil Code states that "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

**556.**

Article 2316 of the Louisiana Civil Code provides that "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

**557.**

Under Louisiana law, to establish actionable negligence, one must show the defendant had a duty to conform its conduct to a specific standard (the duty element); the defendant failed to conform its conduct to the appropriate standard (the breach of duty element); the defendant's substandard conduct was a cause-in-fact of Plaintiff's injuries (the cause-in-fact element); the defendant's substandard conduct was a legal cause of the Plaintiff's injuries, that is, the risk and the harm caused were within the scope of protection afforded by the duty breached (the scope of liability or scope of protection element); and actual damages (the damages element). All such essential elements exist here.

**558.**

Further, as Section 302B of the Restatement of Torts provides: "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."

**559.**

Each Defendant had obligations to exercise reasonable care in manufacturing, marketing, selling, and/or distributing highly dangerous opioid drugs to the State, West Ascension, Parish and Plaintiff's Community.

**560.**

Each Distributor Defendant owed a duty to the Plaintiff, and to the public in the Parish, West Ascension and Plaintiff's Community, because the injury was foreseeable, and in fact foreseen, by the Defendants.

**561.**

Reasonably prudent distributors of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities, and the significant costs which would be imposed upon the governmental entities associated with those communities. The closed system of opioid distribution whereby wholesale distributors are the gatekeepers between

manufacturers and pharmacies, and wherein all links in the chain have a duty to prevent diversion, exists for the purpose of controlling dangerous substances such as opioids and preventing diversion and abuse.

### 562.

The Defendants were repeatedly warned by law enforcement of the unlawfulness and consequences of their actions and omissions.

### 563.

The escalating amounts of addictive drugs flowing through Distributor Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Distributor Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

### 564.

As described above in allegations expressly incorporated herein, Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution of dangerous opioids, which are Schedule II Controlled Substances, by failing to monitor for, failing to report, and filling highly excessive or unusual orders time and again. Because the very purpose of these duties was to prevent the resulting harm – diversion of highly addictive drugs for nonmedical purposes – the causal connection between Distributor Defendants' breach of duties and the ensuing harm was entirely foreseeable.

### 565.

As described elsewhere in the Petition in allegations expressly incorporated herein, Defendants misrepresented their compliance with their duties under the law and concealed their noncompliance and shipments of excessive or unusual orders of opioids to the Parish and Plaintiff's Community and destinations from which they knew opioids were likely to be diverted into the Parish and Plaintiff's Community, in addition to other misrepresentations alleged and incorporated herein.

### 566.

The Defendants breached their duties to prevent diversion and report and halt excessive or unusual orders, and they misrepresented their compliance with their legal duties.

**567.**

The Defendants' breaches were intentional and/or unlawful, and their conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

**568.**

The causal connection between the Defendants' breaches of their duties and misrepresentations and the ensuing harm was entirely foreseeable.

**569.**

The Defendants' breaches of their duties and misrepresentations were the cause-in-fact of Plaintiff's injuries.

**570.**

The risk of harm to Plaintiff, the Parish and Plaintiff's Community and the harm caused were within the scope of protection afforded by the Defendants' duty to exercise due and reasonable care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs in the State, Parish and Plaintiff's Community. The Defendants' substandard conduct was a legal cause of the Plaintiff's injuries.

**571.**

As described above in allegations expressly incorporated herein, the Defendants' breaches of duty and misrepresentations they caused, bears a causal connection with, and/or proximately resulted in the damages sought herein.

**572.**

The Defendants were manufacturing, marketing, promoting, selling, and distributing dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. The Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than medical, scientific, or industrial channels. However, the Defendants breached their duties to monitor for, report, and halt excessive or unusual orders, breached their duties to prevent diversion, and, further, misrepresented what their duties were and their compliance with their legal duties.

**573.**

The Defendants failed to disclose the material facts that *inter alia* they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion, protect against addiction and severe harm, and specifically monitor, investigate, report, and refuse

excessive or unusual orders. But for these material factual omissions, the Defendants would not have been able to sell opioids.

### 574.

The Defendants' unlawful and/or intentional actions create a rebuttable presumption of negligence and negligent misrepresentations under State law.

### 575.

Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from the Defendants' actions and omissions.

### 576.

Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

### COUNT IX: FRAUD AND FRAUDULENT MISREPRESENTATION

### 577.

Plaintiff incorporates by reference all other paragraphs of this Petition as if fully set forth here, and further alleges as follows.

### 578.

Under Louisiana law, "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. Civ. Code Ann. art. 1953.

### 579.

Under Louisiana law, delictual fraud or intentional misrepresentation consists of: 1) a misrepresentation of material fact, 2) made with the intent to deceive and 3) causing justifiable reliance and resultant injury. *Becnel v. Grodner*, 2007-1041 (La. App. 4 Cir. 4/2/08); 982 So. 2d 891, 894.

### 580.

The Defendants violated their general duty not to actively deceive, and have made knowingly false statements and have omitted and/or concealed information which made statements by the Defendants knowingly false. The Defendants acted intentionally and/or unlawfully.

**581.**

As alleged herein, the Defendants made false statements regarding their compliance with law regarding their duties to prevent diversion, their duties to monitor, report and halt excessive or unusual orders, and/or concealed their noncompliance with these requirements.

**582.**

As alleged herein, the Defendants knowingly and/or intentionally made representations that were false. The Defendants had a duty to disclose material facts and concealed them. These false representations and concealed facts were material to the conduct and actions at issue. The Defendants made these false representations and concealed facts with knowledge of the falsity of their representations, and did so with the intent of misleading Plaintiff, West Ascension. the Parish, Plaintiff's Community, the public, and persons on whom Plaintiff relied.

**583.**

These false representations and concealments were reasonably calculated to deceive Plaintiff, the Parish, Plaintiff's Community, and the physicians who prescribed opioids for persons in the Parish, West Ascension and Plaintiff's Community, were made with the intent to deceive, and did in fact deceive these persons.

**584.**

Plaintiff, West Ascension. the Parish, Plaintiff's Community, and the physicians who prescribed opioids reasonably relied on these false representations and concealments of material fact.

**585.**

Plaintiff justifiably relied on the Defendants' representations and/or concealments, both directly and indirectly. Plaintiff's injuries were proximately caused by this reliance.

**586.**

The injuries alleged by Plaintiff herein were sustained as a direct and proximate cause of the Defendants' fraudulent conduct.

**587.**

Plaintiff seeks economic losses (direct, incidental, and/or consequential pecuniary losses) resulting from Defendants' fraudulent activity, including fraudulent misrepresentations and fraudulent concealment. Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by the Defendants' actions.

131

**588.**

Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

### COUNT X: UNJUST ENRICHMENT

**589.**

Plaintiff incorporates by reference all previous allegations within the preceding paragraphs as if fully set forth herein and further alleges as follows:

**590.**

Louisiana Civil Code article 2298 provides, "A person who has been enriched without cause at the expense of another person is bound to compensate that person."

**591.**

As an expected and intended result of their conscious wrongdoing as set forth in this Petition, Defendants have unjustly profited and benefited from opioid purchases made by persons located in the Parish, West Ascension and Plaintiff's Community. The Defendants' retention of said profits and benefits violates the fundamental principles of justice, equity, and good conscience.

**592.**

By virtue of the acts alleged herein, Defendants knowingly, willfully, and intentionally marketed, promoted and/or distributed opioid medications in a false and deceptive manner and knowingly, willfully, and intentionally and without justification withheld information from persons located in the Parish, West Ascension and Plaintiff's Community, their insurers, public health providers, prescribers, medical assistance programs and other government payors regarding the risks associated with long term opioid therapy.

**593.**

By illegally and deceptively promoting opioids to treat chronic pain, directly, and/or through their control of third parties, and/or by acting in concert with third parties, Defendants have unjustly enriched themselves at Plaintiff's expense. Because of their deceptive promotion of opioids, and other deceptive and fraudulent conduct, Defendants obtained enrichment, to the detriment of Plaintiff, that they would not otherwise have obtained; to wit, as set forth herein, as

132

a result of the opioid epidemic, Plaintiff has incurred damages including but not limited to the increased costs associated with opioid addiction. The enrichment of Defendants at the expense of Plaintiff was without justification.

**594.**

Plaintiff demands judgment against each Defendant for restitution and disgorgement of any profits which have been obtained at the expense of Plaintiff.

## JURY DEMAND

**595.**

Plaintiff hereby demands trial by jury.

## PRAYER FOR RELIEF

**596.**

WHEREFORE, Plaintiff West Ascension Parish Hospital Service District respectfully requests that this Court enter an order of judgment in favor of the Plaintiff and against each of the Defendants *in solido*, granting  all relief requested in this Petition for Damages and/or allowed at law or in equity, including:

      a.   abatement of the nuisance;

      b.   ordering defendants to fund an abatement fund;

      c.   actual damages;

      d.   treble or multiple damages and civil penalties as allowed by statute;

      e.   punitive damages;

      f.   exemplary damages;

      g.   disgorgement of unjust enrichment;

      h.   equitable and injunctive relief in the form of Court-enforced corrective action,  programs, and communications, and enjoinment of each Defendants and its employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or in participation with each Defendant;

      i.   forfeiture, disgorgement, restitution and/or divestiture of proceeds and assets;

      j.   attorneys' fees;

      k.   costs and expenses of suit;

      l.   pre- and post-judgment interest; and

m. such other and further relief as this Court deems appropriate.

Respectfully submitted,

By: _____

Walter J. Leger, Jr., La. Bar No. 8278
Franklin G. Shaw, La. Bar No. 01594
Walter J. Leger III, La. Bar No. 28656
Brigid E. Collins, La. Bar No. 28538
Matthew S. Landry, La. Bar No. 36543
**LEGER & SHAW**
935 Gravier Street, Suite 2150
New Orleans, LA 70112
Telephone: (504) 588-9043
Facsimile: (504) 588-9980
wleger@legershaw.com
fshaw@legershaw.com


Charles S. Long, La. Bar No.1189
Spencer Long, La. Bar No. 38041
**LONG & LONG**
316 Chetimatches St.
Donaldsonville, LA 70346
Telephone: (225) 473-9215
Facsimile: (225) 473-6424
chuckslong@aol.com


*Counsel for Plaintiff,*
**WEST ASCENSION PARISH
HOSPITAL SERVICE DISTRICT**


**SERVICE INSTRUCTIONS ATTACHED**

**PLEASE SERVE**

**ALLERGAN PLC F/K/A ACTAVIS PLC**
Through the Long Arm Statute
Morris Corporate Center III
400 Interpace Parkway
Parsippany, NJ 07054

**ALLERGAN FINANCE, LLC F/K/A ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.**
Through the Long Arm Statute
5 Giralda Farms
Madison, NJ 07940

**ALLERGAN SALES, LLC**
Through its Registered Agent
C T Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

**ALLERGAN USA, INC.**
Through its Registered Agent
C T Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

**WATSON LABORATORIES, INC.**
Through the Long Arm Statute
577 Chipeta Way
Salt Lake City, Utah 84108

**WARNER CHILCOTT COMPANY, LLC**
Through the Long Arm Statute
365 San Francisco Street
Penthouse Old
San Juan, PR 00901

**ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.**
Through its Registered Agent
Corporate Creations Network, Inc.
1070-B West Causeway Approach
Mandeville, LA 70471

**ACTAVIS SOUTH ATLANTIC LLC**
Through the Long Arm Statute
13800 N.W. 2nd Street
Suite 190
Sunrise, FL 33325

**ACTAVIS ELIZABETH LLC**
Through the Long Arm Statute
200 Elmora Avenue
Elizabeth, NJ 07207

**ACTAVIS MID ATLANTIC LLC**
Through the Long Arm Statute
7125 Columbia Gateway Drive
Columbia, MD 21046-2552

**ACTAVIS TOTOWA LLC**
Through the Long Arm Statute
101 East Main Street
Little Falls, NJ 07424

**ACTAVIS, LLC**
Through its Registered Agent
Corporate Creations Network, Inc.
1070-B West Causeway Approach
Mandeville, LA 70471

**ACTAVIS KADIAN LLC**
Through the Long Arm Statute
60 Columbia Road
Building B
Morristown, NJ 07960

**ACTAVIS LABORATORIES UT, INC. F/K/A WATSON LABORATORIES, INC.-SALT LAKE CITY**
Through the Long Arm Statute
577 South Chipeta Way
Salt Lake City, UT 84108

**ACTAVIS LABORATORIES FL, INC. F/K/A WATSON LABORATORIES, INC.-FLORIDA**
Through the Long Arm Statute
4955 SW 45th Street
Fort Lauderdale, FL 33301

**TEVA PHARMACEUTICAL INDUSTRIES, LTD.**
Through the Long Arm Statute
3 Basel Street
Petach, Tikva 49131, Israel

**TEVA PHARMACEUTICALS USA, INC.**
Through the Long Arm Statute
1090 Horsham Road
North Wales, PA 19454

**CEPHALON, INC.**
Through the Long Arm Statute
41 Moores Road
Malvern, PA 19355

**JOHNSON & JOHNSON**
Through the Long Arm Statute
1 Johnson & Johnson Plaza
New Brunswick, NJ 08933

**JANSSEN PHARMACEUTICALS, INC.**
Through the Long Arm Statute
1125 Bear Tavern Rd.
Titusville, NJ 08560

**ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.**
Through the Long Arm Statute
1125 Bear Tavern Rd.
Titusville, NJ 08560

**JANSSEN PHARMACEUTICA INC. N/K/A JANSSEN PHARMACEUTICALS, INC.**
Through the Long Arm Statute
1125 Bear Tavern Rd.
Titusville, NJ 08560

**NORAMCO, INC.**
Through the Long Arm Statute
Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**ENDO HEALTH SOLUTIONS INC.**
Through the Long Arm Statute
1400 Atwater Drive
Malvern, PA 19355

**ENDO PHARMACEUTICALS, INC.**
Through the Long Arm Statute
1400 Atwater Drive
Malvern, PA 19355

**PAR PHARMACEUTICAL, INC**
Through the Long Arm Statute
One Ram Ridge Road
Chestnut Ridge, NY 10977

**PAR PHARMACEUTICAL COMPANIES, INC. F/K/A PAR PHARMACEUTICAL HOLDINGS, INC.**
Through the Long Arm Statute
One Ram Ridge Road
Chestnut Ridge, NY 10977

**MALLINCKRODT PLC**
Through the Long Arm Statute
3 Lotus Park
The Causeway
Staines-Upon-Thames, TW18 3AG, United Kingdom

**MALLINCKRODT LLC**
Through the Long Arm Statute
Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**SPECGX LLC**
Through its Registered Agent
C T Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

**MYLAN PHARMACEUTICALS, INC.**
Through its Registered Agent
C T Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

**WEST-WARD PHARMACEUTICAL CORP. N/K/A HIKMA PHARMACEUTICALS USA INC.**
Through the Long Arm Statute
401 Industrial Way West
Eatontown, NJ 07724-4240

**INDIVIOR INC.**
Through the Long Arm Statute
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802

**NOVARTIS PHARMACEUTICALS CORP**
Through its Registered Agent
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, La 70802

**SANDOZ, INC.**
Through the Long Arm Statute
506 Carnegie Center Drive
Princeton, NJ 08540

**MCKESSON CORPORATION**
Through its Registered Agent
CORPORATION SERVICE COMPANY
501 Louisiana Avenue
Baton Rouge, LA 70802

**CARDINAL HEALTH, INC.**
Through the Long Arm Statute
7000 Cardinal Place
Dublin, OH 43017

**AMERISOURCEBERGEN DRUG CORP ORATION**
Through its Registered Agent
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

**CVS HEALTH CORPORATION**
Through the Long Arm Statute
One CVS Drive
Woonsocket, RI 02895

**CVS TN DISTRIBUTION, LLC f/k/a CVS TN DISTRIBUTION, INC.**
Through its registered agent
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

**CVS PHARMACY, INC.**
Through its registered agent
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

**WALGREENS BOOTS ALLIANCE, INC.**
Through the Long Arm Statute
108 Wilmot Road
Deerfield, IL 60015

**WALGREEN CO.**
Through the Long Arm Statute
200 Wilmot Road
MS Suite 2002
Deerfield, IL 60015

**WALMART INC. F/K/A WAL-MART STORES, INC.**
Through its Registered Agent
CT Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816

**LOUISIANA WHOLESALE DRUG CO., INC.**
Through its Registered Agent
Chad Gielen
2085 I-49 S. Service Road
Sunset, LA 70584

**MORRIS AND DICKSON CO., LLC.**
Through its Registered Agent
M. A. Dickson, Jr.
410 Kay Lane
Shreveport, Louisiana 71115

06/12/20 Scanned  AS

WEST ASCENSION PARISH :    NUMBER: 128876  DIV. A
HOSPITAL SERVICE DISTRICT :
D/B/A PREVOST MEMORIAL :
HOSPITAL :

VERSUS :    23rd JUDICIAL DISTRICT

AMERISOURCEBERGEN DRUG :    ASCENSION PARISH, LOUISIANA
CORPORATION, ET AL :

## UNOPPOSED MOTION FOR EXTENSION
## OF TIME TO FILE RESPONSIVE PLEADINGS

NOW INTO COURT, through undersigned counsel, comes Defendant, MCKESSON CORPORATION ("McKesson" or "defendant"), who respectfully requests an extension of time within which to file responsive pleadings, as follows:

1.

McKesson, through undersigned counsel, accepted informal service of plaintiff's Petition on May 22, 2020, and responsive pleadings would otherwise be due on June 8, 2020.

2.

Plaintiff's Petition is 139 pages in length and contains 596 separate allegations.

3.

Given the length and complexity of the Petition, McKesson needs additional time to review plaintiff's claims and conduct the investigation necessary to prepare and file responsive pleadings.

4.

McKesson respectfully requests a 60-day extension of time to file responsive pleadings to and including July 21, 2020.

5.

Undersigned counsel is authorized to represent that counsel for plaintiff has no objection to the issuance of an Order granting this extension.

WHEREFORE, DEFENDANT, MCKESSON CORPORATION, PRAYS that the

Court issue an Order extending the time for defendant to file responsive pleadings, to and

including July 21, 2020.

Shreveport, Louisiana this _9_ day of June, 2020.

BLANCHARD, WALKER, O'QUIN & ROBERTS
(A Professional Law Corporation)

By: _____
W. Michael Adams, Bar #2338
Scott R. Wolf, Bar #28277
Stacey D. Williams, Bar #22689

Post Office Drawer 1126
Shreveport, Louisiana 71163-1126
Telephone:      (318) 221-6858
Telecopier:     (318) 227-2967
E-Mail:   madams@bwor.com
          swolf@bwor.com
          swilliams@bwor.com

ATTORNEYS FOR DEFENDANT,
MCKESSON CORPORATION

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the above and foregoing Unopposed Motion for Extension of Time to File Responsive Pleadings and proposed Order have this date been served upon plaintiff, WEST ASCENSION PARISH HOSPITAL SERVICE DISTRICT, through counsel of record, as follows:

> Walter J. Leger, Jr.
> Franklin G. Shaw
> Walter J. Leger III
> Brigid E. Collins
> Matthew S. Landry
> LEGER & SHAW
> 935 Gravier Street, Suite 2150
> New Orleans, LA 70112
> wleger@legershaw.com
> fshaw@legershaw.com
>
> Charles S. Long
> Spencer Long
> LONG & LONG
> 316 Chetimatches St.
> Donaldsonville, LA 70346
> chuckslong@aol.com

*via* e-mail and/or by placing same in the United States Mail, postage prepaid and properly addressed.

Shreveport, Louisiana, this ___9___ day of June, 2020.

_____
Stacey D. Williams

3

FILED
HANNA
CLERK OF COURT

WEST ASCENSION PARISH :       NUMBER: 128876 DIV A
HOSPITAL SERVICE DISTRICT :
D/B/A PREVOST MEMORIAL :
HOSPITAL :

VERSUS :                       23rd JUDICIAL DISTICT

AMERISOURCEBERGEN DRUG :      ASCENSION PARISH, LOUISIANA
CORPORATION, ET AL :

## ORDER

The foregoing Unopposed Motion for Extension of Time to File Responsive
Pleadings having been considered:

IT IS HEREBY ORDERED that defendant, MCKESSON CORPORATION, is
granted an extension of time until July 21, 2020 within which to file responsive pleadings
to the Petition filed by plaintiff.

Donaldsonville, Louisiana, this ____ day of June, 2020.

_____
DISTRICT JUDGE